**Vernon Eugene McMANUS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 58886.

Court of Criminal Appeals of Texas, En Banc.

Dec. 5, 1979.

Rehearing Denied Jan. 16, 1980.

Mark Vela and Stanley G. Schneider, Houston, Don Smith, Baytown, for appellant.

Carol S. Vance, Dist. Atty., Michael C. Kuhn, Stu Stewart and Michael J. Hinton, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for capital murder, wherein the punishment was assessed at death. Appellant was convicted of acting with Paula Cantrell Derese to cause the death of Paul Cantrell for remuneration or the promise thereof, which was to be money from the proceeds of life insurance and the estate of Paul and Mary Cantrell.

In his fifteenth ground of error, appellant challenges the sufficiency of the evidence to show that the murder was committed for remuneration or the promise thereof.

In the early morning hours of July 25, 1976, the bodies of the deceased, Paul and Mary Cantrell, were discovered in their home by their daughter, Paula Cantrell Derese. They were found lying on the floor of their den, and both had been strangled and had had their throats cut. Four days later, Paula, the only child of Paul and Mary, gave a statement in which she implicated herself and appellant in the murders. Paula, in testifying against appellant, stated that she had pled guilty to the murders of her parents, and that by her conduct, she had encouraged the commission of the crime. She stated that she admitted her part in the crime because she could not have taken her parents' money and lived like she wanted to.

Paula first met appellant in 1970, when she lived in Beaumont and worked for Lamar University, where appellant was an assistant football coach. She later married Herbie Derese and had a son, Chad, in December of 1973. Her parents did not approve of Paula's marriage to Herbie. In 1975, Paula and Herbie separated and Paula, with her son, moved into her parents' home in Baytown. She lived there with her parents until their deaths in July of 1976. During this period of time, there was conflict between Paula and her parents, over Paula's desire to reconcile with her husband. There was testimony that Paula's father had threatened to wage a court battle for the legal custody of Chad if Paula reconciled with Herbie.

In January or February of 1976, appellant reestablished contact with Paula. Paula testified that at this time, she refused to go out with him. However, she talked to

him several times on the telephone. A few weeks later, she had a serious argument with her parents about Herbie and was upset. She agreed to have lunch with appellant, and at this time discussed her problems with her parents with him. She testified that she told appellant that she would do anything to be free of her parents. Appellant responded that he knew of a way that that could be taken care of so that she would not have to worry about that again. Appellant also asked her about how much insurance Herbie had, and whether she wanted him killed. Paula responded that she did not want Herbie killed.

Sometime during February, appellant co-signed a $1,500 loan which Paula took out.

About two weeks after their first meeting, during which time Paula and appellant talked on the telephone several times, they met again for lunch. At this meeting, appellant told Paula that things had been taken care of so that she would not have to worry about it again. He told her that he knew some people who killed people for money, and that there had already been a payment made to have her parents killed. Paula testified that she was supposed to pay appellant out of the proceeds of her parents' estate and life insurance; appellant told her that he wanted one-third. She testified that although she never expressly told him that she would pay him, she "let it slide." She stated that at this time, she did not believe that he was serious.

In March of 1976, appellant and his business partner, Vernon Olney, came to Paula's parents' house to discuss a business matter, and Paula, with her mother, showed appellant through the house.

Paula and appellant maintained communication, and in April, Paula went to work for appellant as his secretary in his plywood brokerage business. She testified that at this time, she thought appellant was serious about having her parents murdered.

On Easter weekend, Paul and Mary had made plans to meet some friends in Austin to play golf. Prior to this weekend, appellant had a discussion with Paula about insurance double indemnity and "making something look like an accident." Paula stated that she did not know what this meant. Appellant knew of the deceased's plans Easter weekend, and Paula told him the motel in which they would be staying. Paula testified that when her parents left for their trip, she thought that something was going to happen to them that weekend. She thought that appellant was serious about murdering them. When questioned about whether she tried to warn them, she stated that she just could not tell them about the situation. She admitted that this was when she started encouraging the murders of her parents. She testified that she turned her back on the situation. Still, she called her parents several times that weekend, and they returned home safely.

In May, appellant discussed with Paula borrowing money from a credit union; this money was to be used to pay the person who was supposed to do the killings. He also told her that the "contact person" or "hit man" was sick in Ohio at that time.

During this time, Paula also became familiar with the name "Ben T." and knew that he was somehow involved in the scheme to have her parents murdered.

During June, appellant was drinking heavily and was gone frequently from his business. Testimony showed that appellant was trying, but was not able to have the murders done soon. He told Paula that he should not have counted upon anyone else to do the killings, that he should have done them himself. He said that he would walk up to the deceased's house and act like he was going to talk about business and kill them himself.

On Friday, July 23rd, Paula talked to appellant on the telephone from her house. She had observed him drive by her house that day. Appellant told her that "the man is in the area" and told her to leave the house. He had previously warned her not to be in the house when "the man" came. That evening, Paula went over to a friend's house and returned home shortly before midnight.

Paula again talked to appellant on Saturday, July 24th, and told him that she had a date that evening; she further told him that her parents would be at home that night. That night, when she returned home from her date, she discovered the bodies of her parents in their den. Over the next few days, appellant visited Paula several times, and repeatedly told her to "keep her mouth shut and not to crack." He then told her how the murders had occurred and that he had been present during them. According to his statements to Paula, appellant had rented a car from the Houston airport and had picked up two men. They then proceeded to the Cantrell house. All of them wore gloves. They had used a pipe to hit the victims in the head, and then had cut their throats. The three had started to ransack the house, but a car pulled up across the street, so they left. Appellant had also made a comment that if one hair was found on the bodies of the deceased, "he [appellant] was dead."

In her written confession, Paula stated that during the months that she worked for appellant, "he always talked about it [the murders] . . . He kept talking about it all the time until it happened." On the day of the murders, appellant called and "told me that the man had called him Friday and said three is a crowd. I knew what he meant because he had told me in the past that it might not matter if I and Chad were there. He was afraid something would happen to me and he couldn't get any insurance money."

In her testimony at trial, Paula denied that she expressly told appellant that she would pay him, or that she ever expressly promised to pay him. She testified that, instead, he had *told* her that she was to pay him one-third of the proceeds of the estate. She testified that she had not thought through *how* she was to give him the money, because "the reality of it never really hit [her]."

Paula was examined extensively about her involvement in the murders, beyond her confession to the crime and entry of pleas of guilty to the murders. She was asked,

"Q. To you, then, knowledge [of the planned murders] is encouragement? In other words, knowing about it and you didn't tell somebody?

"A. [Paula] That's right.

"Q. Is this what you meant?

"A. Yes.

"Q. And so far as you are concerned, that is what has really brought you to this courtroom, is that you had knowledge but you never really encouraged . . . ?

"A. And by his saying that he got a third of the estate and me agreeing to that, that's right.

"Q. Oh, you agreed to it?

"A. Well, I guess. I didn't do anything about it."

Ben Tabor, an acquaintance of appellant's, testified that in March appellant had approached him about finding a professional killer or "hit man." Appellant told Tabor that two people were to be killed, and that their daughter would be the beneficiary, and that he was to receive one-third of the estate. The recorder further reflects that appellant twice made payments of $6,000 each to Tabor to give to the "hit man" whom Tabor said he had procured for appellant.

Donna French, appellant's girlfriend in June and July, testified that during these months, appellant had mentioned leaving town or vacationing somewhere. However, appellant told her that this would not be until around mid-August "because he was going to run into some money."

Candy Campbell, a friend of Paula's and an acquaintance of appellant's, testified that she and Paula had planned a trip to California during June. Paula had received permission from appellant, her employer, to go. However, appellant changed his mind in June and would not let Paula leave. Campbell spoke to appellant about this, and appellant told her, "Well, if you all will just wait until late August [to go], I will pay for everything."

Don Janowski, another acquaintance of appellant's, testified that in February of 1976, appellant approached him and inquired about finding a "hit man." Janowski testified that he believed appellant said that he was going to "hit" two people.

We hold that the evidence is sufficient to show that appellant committed murder "for remuneration or the promise of remuneration" as alleged in the indictment. See V.T.C.A. Penal Code, Section 19.03(a)(3). The conduct proscribed by this section of the capital murder statute is the killing of any person in order to receive, or for the purpose of receiving some benefit or compensation. Thus, the focus of the criminal culpability is upon the actor's state of mind.

The record clearly reflects that appellant *expected* to share in the proceeds from the estate of the victims and that he acted out of an expectation that he would receive such remuneration. He made payments totaling $12,000 to hire a professional killer; he made statements to others that he was to receive a share of the victims' estate upon their deaths, and he indicated to two people that he expected to "come into" some money in August.

Further, appellant could have inferred from Paula's conduct that she agreed to and acquiesced in his request for one-third of the proceeds of the estate. Paula knew that appellant was serious about having her parents murdered, and, according to her own testimony, she listened to appellant discuss these plans frequently. She discussed her parents' financial status with appellant, and gave him information concerning their activities, including their whereabouts at certain times. The record is clear that appellant perceived Paula's conduct as an implicit promise of a benefit and that he acted upon that basis.

Upon review by this Court, the evidence must be viewed in the light most favorable to the jury's verdict. *Jones v. State*, 582 S.W.2d 129 (Tex.Cr.App.1979); *Seaton v. State*, 564 S.W.2d 721 (Tex.Cr.App.1978); *Rogers v. State*, 550 S.W.2d 78 (Tex.Cr.App. 1977); *Clark v. State*, 543 S.W.2d 125 (Tex. Cr.App.1976). We find that the evidence is sufficient to support the jury's finding that appellant committed the murders for remuneration or the anticipation thereof.

Appellant further contends that the evidence is insufficient to sustain the conviction because there is no corroboration of the accomplice witness' testimony. The jury was charged that Paula Derese was an accomplice witness as a matter of law. On the basis of Ben Tabor's testimony that he had led appellant to believe that he had procured a "hit man" for appellant, but that he in fact had not done so, but rather had told appellant this to "con" him out of money, the jury was charged that they could find Tabor an accomplice witness as a matter of fact.

Article 38.14, Vernon's Ann.C.C.P. provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

In *Carrillo v. State*, 566 S.W.2d 902 (Tex. Cr.App.1978), we reiterated that:

"[t]he test as to the sufficiency of the corroboration [of the accomplice witness' testimony] is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends *to* connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not."

See also *Bentley v. State*, 520 S.W.2d 390 (Tex.Cr.App.1975); *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968). Further, the mere showing that an offense occurred is not sufficient corroboration. *Carrillo v. State*, supra; *Windham v. State*, 479 S.W.2d 319 (Tex.Cr.App.1972). It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt, *Carrillo v.*

*State,* supra; *Attwood v. State,* 509 S.W.2d 342 (Tex.Cr.App.1974); it need only make the accomplice witness' testimony more likely than not. *Carrillo v. State,* supra; *Warren v. State,* 514 S.W.2d 458 (Tex.Cr. App.1974).

■ Even if we assume that Tabor, as well as Paula, was an accomplice witness, appellant's contention is without merit. The record reflects that two witnesses testified that appellant indicated to them that he expected to be "coming into" some money in August, the month after the murders. Don Janowski testified that in February 1976, appellant approached him and inquired about finding a "hit man" and indicated that he wanted two people killed. There was testimony that appellant rented a white Monte Carlo from the Houston airport on the afternoon before the murders and returned it the next morning. Two other witnesses, Ken Giles and Reid Hughes, both testified that they saw a car matching that description around the deceased's neighborhood and house the afternoon of the murders. Further, Hughes identified appellant as the driver of that car. The record further reflects that appellant altered his physical appearance the day after the murders, and then fled the jurisdiction immediately prior to his trial setting. We hold that this other inculpatory evidence tends to connect appellant with the commission of the offense and makes the accomplice testimony more probable than not. Thus, the testimony is sufficiently corroborated. See *Carrillo v. State,* supra; *Bentley v. State,* supra; *Warren v. State,* supra. Appellant's challenges to the sufficiency of the evidence to sustain the conviction are overruled.

In his first ground of error, appellant contends that:

"[t]he Trial Court erred in overruling Appellant's motion to quash the indictment in that it failed to apprise the Appellant as to the capacities in which he was alleged to have committed capital murder, to wit; whether he promised someone remuneration and whom did he promise or was he promised remuneration and by whom."

Appellant filed his motion to quash the indictment on March 7, 1977. A hearing was held on that date, after which the trial court overruled the motion.

V.T.C.A. Penal Code, Sec. 19.03 provides that:

"(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

\* \* \* \* \* \*

"(3) *the person commits the murder for remuneration or the promise of remuneration* or employs another to commit the murder for remuneration or the promise of remuneration." (Emphasis added)

The indictment charging appellant with capital murder alleged in part that appellant:

". . . did then and there unlawfully, intentionally and knowingly, acting as a party with Paula Cantrell Derese and other persons to the Grand Jury unknown, cause the death of Paul Harvey Cantrell by choking and strangling him with a cord and cutting him with a knife; and said murder was committed for remuneration and the promise of remuneration, namely, money from the proceeds of life insurance and the estate of Paul Harvey Cantrell and Mary Bright Cantrell."

Article 21.02, Vernon's Ann.C.C.P. provides that in an indictment, the offense must be set forth in plain and intelligible words. Further, an indictment "shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged." Article 21.11, Vernon's Ann.C. C.P.

■ Appellant now contends that the indictment failed to apprise him of the charge against him with such particularity as to enable him to prepare his defense. This

contention was raised prior to trial, and therefore the fundamental constitutional protections of adequate notice and due process are involved. *Haecker v. State*, 571 S.W.2d 920 (Tex.Cr.App.1978); *Drumm v. State*, 560 S.W.2d 944 (Tex.Cr.App.1977). These fundamental protections require careful examination and consideration from the perspective of the accused. *Haecker v. State*, supra.

■ An indictment must allege *facts* sufficient to give the accused notice of the particular offense with which he is charged. Article 21.11, supra. As we stated in *Haecker v. State*, supra:

"[i]t is not sufficient to say that the accused knew with what offense he was charged; rather, we must inquire as to whether the face of the instrument sets forth in plain and intelligible language sufficient information to enable the accused to prepare his defense. *Moore v. State*, 532 S.W.2d 333 (Tex.Cr.App.1976)."

■ In the instant case, the indictment clearly alleges that appellant did *cause* the death of Paul Cantrell, by choking and strangling him with a cord and cutting him with a knife, and that this murder was committed for remuneration and the promise thereof, which was to be the proceeds from the life insurance and estate of the deceased. Thus, the indictment clearly sets out the *acts* committed by appellant constituting the offense. The indictment is *not* susceptible to the interpretation, as appellant alleges, that appellant *employed* another to do the killing or that he promised *another* person compensation for doing it; it clearly alleges that *appellant* committed the murder and that *he was promised* compensation by another to do it.

■ Thus, the issue presented to this Court is whether the indictment failed to allege *who* promised appellant such remuneration for committing the murder, and whether this denied appellant adequate notice of the charge against him. We hold that there was no such failure to give appellant notice.

The indictment alleged that appellant committed the murder, "acting as a party with Paula Cantrell Derese and other persons to the Grand Jury unknown," and that such murder was committed for remuneration. The clear import of this language is that the remuneration or the promise of remuneration was to be supplied by this named party to the offense or by a person or persons unknown. While no model, the indictment, when read as a whole, does, indeed, give appellant sufficient notice of who promised him or was to supply him the remuneration. While there is some evidence in this case that appellant attempted to and perhaps succeeded in hiring someone to do the killings with him, this is not the offense for which appellant was indicted and prosecuted. The gravamen of the capital murder offense charged in this indictment, of which appellant was given notice, was his having been promised compensation by Paula to kill the victims and on that basis, having killed them. Since the indictment sufficiently alleges facts to enable appellant to prepare his defense, the indictment was not subject to a motion to quash on this ground.

Appellant's reliance upon *Hobbs v. State*, 548 S.W.2d 884 (Tex.Cr.App.1977) is misplaced. Therein, we held that the indictment for *attempted* capital murder was fundamentally defective for the failure to allege, as is necessary in charging an attempted offense, that acts were done "amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." V.T.C.A. Penal Code, Section 15.01(a). Thus, the basis of that holding was the failure of the indictment to allege an *element* of the *offense*. This holding is completely inapplicable to the instant case. Appellant's first ground of error is overruled.

In his second ground of error, appellant contends that the trial court erred in failing to grant his motion for a change of venue as a matter of law since his motion was uncontroverted by the State prior to jury selection.

Article 31.03, Vernon's Ann.C. C.P., provides that a defendant in a criminal case may file in the trial court a motion for a change of venue, supported by affidavits. Article 31.04, Vernon's Ann.C.C.P., allows the State to file controverting affidavits. The filing of such controverting affidavits raises an issue of *fact* to be tried and resolved by the trial court; thus, the trial court must then make a determination of this issue on its merits. Such decision on the merits is within the discretion of the court, and will only be reversed by this Court upon a showing that the trial court abused its discretion. *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr.App.1977); *Adami v. State,* 524 S.W.2d 693 (Tex.Cr.App.1975).

However, if no controverting affidavit is filed by the State, the defendant is entitled to a change of venue *as a matter of law. Stapleton v. State,* 565 S.W.2d 532 (Tex.Cr.App.1978); *Durrough v. State,* 562 S.W.2d 488 (Tex.Cr.App.1978). The reason that the defendant is entitled to this change as a matter of law is because in the absence of controverting evidence, there is no issue of *fact* to be resolved. When there is no issue of fact to be determined by the trial court, and no place for its exercise of discretion, it must grant the defendant's motion. *Durrough v. State,* supra. This is the reason it is stated that in this situation, a defendant is entitled to such change as a matter of law.

However, it is clear that a defendant may *waive* his *per se* right to a change of venue. If the State has filed no controverting affidavit, and the defendant proceeds to a hearing without objecting that there is no issue of fact to be tried and that he is thus entitled to the change as a matter of law, he waives his right to the *per se* change of venue. *Puryear v. State,* 510 S.W.2d 356 (Tex.Cr.App.1974); *Lewis v. State,* 505 S.W.2d 603 (Tex.Cr.App.1974); see also *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978) (footnote #9). Where the defendant, without such objection, allows the trial court to hear the merits of the issue and to thus exercise its discretion in determining the issue of fact, he cannot thereafter argue that no issue of fact was raised and that he was entitled to the change as a matter of law.

In the instant case, the record reflects that appellant filed his motion for a change of venue on February 28, 1977, in compliance with Article 31.03, supra. The State did not file a controverting affidavit at this time. On March 7, 1977, at a pre-trial hearing, appellant again requested a *hearing* on the motion. The trial court stated that it would not rule on the motion prior to the selection of the jury. On that same date, after the voir dire examination had begun, appellant again requested a *hearing* on the motion, which the trial court denied. Two days later, the record reflects that appellant understood and *acquiesced* in the court's postponing the venue issue until after the voir dire was completed.[1]

1. The record reflects that on March 9, 1977, during the voir dire examination, the following exchange occurred concerning the extent to which defense counsel was entitled to delve into pre-trial publicity with prospective jurors:

"MR. VELA: Your Honor, we are also pursuing this matter in light of a motion for change of venue, so it is not just for cause. We have urged this motion upon the Court. We need to be able to inquire as to the extent of the publicity, the extent of any prejudice, the extent of any discussions. And to restrict us, once again, would deny us two things. One, the determination of their qualifications to sit as jurors and, number two, and more importantly, or just as important, determination as to whether or not a change of venue is in order in this Court. We cannot make either one of those determinations without inquiry.

THE COURT: Counsel, we are right now trying to select a jury.

MR. VELA: I understand.

THE COURT: Now, if we select a jury and you want to hear your motion on a change of venue, we will hear it. I am not precluding you from your motion nor am I combining the jury selection and a motion for a change of venue.

MR. VELA: My understanding was that the Court was carrying it along and was going to wait—

THE COURT: Carrying it along, yes.

MR. VELA: And was going to wait and see—

THE COURT: This is not a motion hearing. This is for selection of the jury. If at the

On April 18, 1977, after the voir dire examination was completed, appellant again mentioned to the court the requested hearing on the motion. The next day, the State filed its controverting affidavit. On that date, a hearing was held on appellant's motion and evidence was received by the court, after which the motion was overruled. The record nowhere reflects that appellant objected to the hearing on the ground that, since his motion had theretofore been uncontroverted, there was no issue of fact to be tried, and that he was thus entitled to the change of venue as a matter of law. Further, the record does not reflect that appellant, after filing the motion, ever requested more than a *hearing*. He never urged the court to *grant* his motion as a matter of law; instead, he persisted in his request for a *hearing* on the motion.

Therefore, the issue is whether, by his failure to request the change as a matter of law and his failure to object to the trial court's holding the hearing, appellant waived his right to the change of venue as a matter of law. Under the authority of *Puryear v. State*, supra, *Lewis v. State*, supra, and *Von Byrd v. State*, supra, we hold that appellant did waive this right. This ground of error is overruled.

Appellant next contends that the trial court abused its discretion in denying this motion for a change of venue after he presented "overwhelming evidence that appellant could not obtain a fair and impartial trial in Harris County . . . ."

On April 19, 1977, after a jury was selected, appellant was granted a hearing on his motion for a change of venue. Much evidence was presented from local newspapers and television stations regarding their coverage and publicity of this case. Numerous lawyers and a few judges testified on appellant's behalf, and stated that appellant could not get a fair and impartial trial in Harris County. Testimony was also presented that appellant could not get a fair and impartial trial because of the publicity surrounding Paula's confessions, and additional detailed reports on the case. On rebuttal, the State presented testimony from witnesses that the pre-trial publicity was not excessive and that appellant could get a fair and impartial trial in Harris County.

We are cognizant that the question of whether a change of venue should be granted because of prejudicial publicity is one of constitutional dimension and that the test to be applied by the court is whether outside influences affecting the community's climate of opinion as to a defendant are so inherently suspect that the resulting probability of unfairness requires suitable procedural safeguards. See *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); see also, *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

An examination of the exhibits introduced at the hearing indicates that all of the information contained in the news reports was accurate and was apparently

---

conclusion, either way, you know, if we are able to conclude by selecting a jury, you want your motion heard, it will be heard in full.

MR. VELA: I am not arguing with the Court. I want the record to reflect exactly what our agreement was so I will have it straight in my mind. My understanding of the agreement—

THE COURT: First of all, I didn't know it was an agreement.

MR. VELA: I am sorry, I misused the word. The order of the Court. I want to make sure I understand and the record reflects the order of the Court relative to the motion. My understanding was that the Court would see how the selection process progressed.

THE COURT: That is correct. Under the law of selecting a jury and not under any motion for change of venue.

MR. VELA: I understand. And then, in order to allow me to complete my sentence, that at the end of some period of time—I believe the Court instructed us that possibly a week—the Court would then determine whether or not, on its own motion, would grant a change of venue."

placed there for the purpose of informing the public of current events. *Bell v. State,* 582 S.W.2d 800 (Tex.Cr.App.1979); *Adami v. State,* 524 S.W.2d 693 (Tex.Cr.App.1975); *Morris v. State,* 488 S.W.2d 768 (Tex.Cr. App.1973); *Taylor v. State,* 420 S.W.2d 601 (Tex.Cr.App.1967). Further, testimony that appellant could not receive a fair and impartial trial in Harris County was contradicted by testimony presented by the State.

In the instant case, the trial court was presented with conflicting testimony with respect to whether appellant could obtain a fair trial in the local community because of pre-trial publicity. This issue was decided adversely to appellant's contentions when the trial judge, as the trier of facts, overruled the motion for change of venue. *Bell v. State,* supra; *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978); *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr.App.1977); *Ransonnette v. State,* 522 S.W.2d 509 (Tex. Cr.App.1975). We hold that the trial court did not abuse its discretion in overruling appellant's motion.

■ After overruling appellant's motion, the court set the trial for April 25, 1977. On this date, appellant failed to appear and his bond was forfeited. Evidence showed that appellant fled the jurisdiction. After he was captured in Florida, and returned to Houston, counsel for appellant reurged his motion for a change of venue. On May 9, 1977, the trial court held another hearing. Appellant introduced into evidence newspaper reports from April 25 to May 7, concerning appellant's flight and apprehension. The parties stipulated that there was coverage of these events carried on radio and television. George Flynn, who previously testified that appellant could get a fair trial in Harris County, testified that since the subsequent publicity of appellant's flight, he thought that it would be difficult for appellant to receive a fair trial there. George Pthick, a radio broadcaster, testified that he had interviewed one of the prosecutors in the case, who had stated that he thought the trial judge would have to move the trial out of Houston. The parties also stipulated that the witnesses who testified at the previous hearing on the motion for change of venue would testify to the same matters now as they had at that previous hearing. This included the testimony that appellant *could* receive a fair trial in Harris County. Thus, the record does not reflect that the trial court abused its discretion in overruling the motion for a change of venue which was reurged prior to trial. See *Bell v. State,* supra; *Adami v. State,* supra; *Morris v. State,* supra. This ground of error is overruled.

■ In two grounds of error, appellant complains of the trial court's imposing limitations on his voir dire examination of two prospective jurors. Particularly, he complains that he was not allowed to freely examine veniremen Benny Ballard and William Achgill concerning any "bias or prejudice resulting from pre-trial publicity." We hold that appellant has failed to preserve error by failing to propound to the trial court specific questions which he claims he was denied the opportunity to ask the two prospective jurors. Further, even if error had been preserved, the record reflects that the trial court's limitation of the voir dire examination was not unreasonable and did not constitute an abuse of discretion.

We point out, as a preliminary matter, that the transcription of the voir dire examination alone in the instant case consisted of more than *five thousand three hundred legal size pages.* Discussions of the trial court's ruling on the limitation of the voir dire examination ran throughout the proceedings. Appellant only directs our attention to certain portions of these discussions; thus, it has been necessary for us to independently examine much of the record in order to ascertain the exact nature of the court's rulings and appellant's particular objections thereto.

The record reflects that during the voir dire examination, the trial court adopted a procedure whereby it would first question each prospective juror about his or her attitude toward the death penalty and inquire about the pre-trial publicity with which each was familiar and its effect upon the prospective juror, in order to determine

whether a bias against appellant existed. After the examination of several jurors by both parties, the State objected to the defense informing the venirepersons that Paula Derese had pled guilty to the murders of her parents. The basis of this objection was that to so inform prospective jurors, who held no conclusion or opinion as to appellant's guilt, might tend to prejudice them against appellant, which would then allow the defense to challenge them for being biased. The defense contended that they were entitled under Article 35.16, Vernon's Ann.C.C.P. to continue the inquiry concerning pre-trial publicity. Towards the end of the discussion, the State clearly delineated that its objection was only to the defense informing the jurors of the content of the pre-trial publicity in the course of examining them. The trial court did not rule at this time.

After examinations of a few more venirepersons, the defense asked for a clarification on this issue. The court stated that if, after its examination, the juror stated that he or she had no conclusion as to appellant's guilt, then it would limit the inquiries as to pre-trial publicity. Appellant objected to the court's ruling in that it denied him the opportunity to determine whether the prospective juror would be impartial. The next time the issue arose, the court restated that where any prospective juror indicated that he or she had formed any conclusion as to appellant's guilt, then the defense could delve into the pre-trial publicity in depth. However, where the venireperson indicated that he or she had formed no conclusion, then the defense would not be permitted to do so.

The trial court first examined venireman Benny Ballard and determined that he had no opinion or conclusion from the pre-trial publicity as to appellant's guilt. After the State had examined Ballard, the defense again objected to the trial court's ruling "prohibiting [them] from, and again, going into the extent of the publicity and any bias or prejudice it may have had on this venireman." This was overruled. After examining Ballard, the defense exercised a peremptory challenge to strike him from the

panel. The record later reflects that after examining venireman William Achgill, the defense accepted him as a juror without any objection.

A discussion of the court's ruling took place again after appellant exhausted his peremptory challenges. The defense again stated its objection to the limitation with regard to another prospective juror. The State responded:

"[PROSECUTOR]: . . . there has been no attempt by Mr. Vela [defense counsel] to explore that area, and that he was not denied exploring that area.

"THE COURT: I agree.

\* \* \* \* \* \*

"[DEFENSE COUNSEL] I would like to inquire as to the Court's ruling on whether or not we can inquire into pre-trial publicity.

"THE COURT: *Counsel, I have never precluded you from going into pre-trial publicity except the manner in which you went into it at the first, that is, to take every news item and bring it up to the juror.*

\* \* \* \* \* \*

"[DEFENSE COUNSEL] . . . we have always been prevented from going into publicity after the venireman has been turned over to us by the State.

"THE COURT: That is not true.

"[DEFENSE COUNSEL] . . . [W]hen we have felt it so necessary to, we have felt that we have done it at our peril and could possibly be held in contempt of Court and this Court's ruling. That has been our position all along.

"THE COURT: Counsel, you did in fact go into it on at least one juror after my ruling. No one objected. The Court did not object. You were not held in contempt. In fact, no comment was ever made about it . . . ."

We hold that appellant has failed to preserve error as to these two grounds. In both cases, appellant failed to propound to the trial court or to let the record reflect what questions concerning pre-trial publici-

ty he complains he was not allowed to ask. In *Graham v. State*, 566 S.W.2d 941 (Tex. Cr.App.1978), we stated, "[a]lthough it is not necessary to show the *answer* that would be given in order to preserve error if a question for exercising peremptory challenges is disallowed, *Burkett v. State*, 516 S.W.2d 147 (Tex.Cr.App.1974), the *question* should certainly appear in the record." See also *Rose v. State*, 470 S.W.2d 198 (Tex.Cr. App.1971); *Longs v. State*, 429 S.W.2d 157 (Tex.Cr.App.1968).

The reason for such a rule is readily apparent in the instant case. In such a lengthy voir dire examination, as here, where the trial court has discretion to impose reasonable limits on the conduct thereof, some questions proposed by the parties regarding the pre-trial publicity might be proper and some would not be. In order for this Court to determine whether the parties' questions were proper questions, they must appear in the record. In the instant case, certainly the trial court did not err in refusing to allow the defense to tell a prospective juror of all the facts which were the subject ·of the publicity, and then to object that he or she had formed a conclusion as to appellant's guilt. The record simply does not reflect what other questions the defense wanted to ask. Without such a showing, we cannot hold that the trial court erred in disallowing certain inquiries into pre-trial publicity of this case.

Further, even if error had been preserved, it is apparent that the trial court did not abuse its discretion in imposing some limitation on the conduct of the voir dire examination.

 We recognize that the right to be represented by counsel, guaranteed by the Sixth Amendment and Article 1, Section 10 of the Texas Constitution, encompasses the right of counsel to question the members of the jury panel in order to intelligently exercise his peremptory challenges. *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979); *Florio v. State*, 568 S.W.2d 132 (Tex.Cr.App. 1978); *Abron v. State*, 523 S.W.2d 405 (Tex. Cr.App.1975); *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974). However, the trial court, within its sound discretion, can and should control the voir dire examination of the venire.

 We reiterate that the trial court may ·impose reasonable restrictions on the exercise of voir dire examination. *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978); see *Emanus v. State*, 526 S.W.2d 806 (Tex. Cr.App.1975); *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974); *Lewis v. State*, 488 S.W.2d 740 (Tex.Cr.App.1972); *McCarter v. State*, 478 S.W.2d 524 (Tex.Cr.App.1972). Duplicitous questions may, within the court's discretion, be limited to curb the prolixity of what can become the lengthiest part of a criminal proceeding. *Bodde v. State*, supra. In the instant case, the transcription of the voir dire examination was especially lengthy. The issue thus presented in such a situation is whether the trial court abused its discretion in the limitations which were imposed on voir dire examination.

In the instant case, the record reflects that the trial court did not err in limiting appellant's voir dire examination of prospective juror Ballard. See Appendix A. Herein, the trial court questioned Ballard concerning the extent of pretrial publicity with which he was familiar. Further inquiry was made concerning whether the juror had formed any opinion or conclusion of appellant's guilt. Thus, the trial court did not abuse its discretion in prohibiting the defense from again questioning the venireman about pre-trial publicity. *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977).

 Neither did the court abuse its discretion in limiting appellant's examination of prospective juror Achgill. See Appendix B. Again, the trial court examined this prospective juror at length concerning the pre-trial publicity with which he was familiar. The court carefully inquired whether Achgill had formed any conclusion as to appellant's guilt or innocence. No abuse of discretion is shown in the court's limitation of duplicitous questioning. *Freeman v. State*, supra.

■ Appellant also contends that the trial court's limitation of his voir dire examination was in violation of Article 35.16, Vernon's Ann.C.C.P. This statute provides, in part:

"Reasons for Challenge for Cause

"(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

\* \* \* \* \* \*

9. That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court. If he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay, and if the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case . . ."

This statute deals with the disqualification of prospective jurors and challenges for cause. The procedure used to determine whether a juror is disqualified applies *only* when a prospective juror states that he or she *has* formed a conclusion as to the guilt or innocence of the defendant. If the juror states that he or she has formed no such conclusion, then, of course, there *is no reason to ask* whether the "conclusion so established" will influence the verdict. Thus, this statute does not, as appellant contends, give the defense absolute statutory authority to examine the jurors about each bit of information recounted in the media.

The record reflects that each of the two veniremen was qualified by the trial court under this statute. No error is shown. Grounds of error four and five are overruled.

■ In his sixth and seventh grounds of error, appellant contends that the trial court erred in granting a challenge for cause after a juror had been sworn and impaneled.

On Friday, March 11, 1977, venireperson Richard Blanchard was examined by the court, the State and the defense, and was selected as the second juror in this case. He was sworn and impaneled. On the following Monday morning, the court notified the parties that Blanchard had contacted the trial judge that morning, indicating that he had some reservations concerning his service on the jury. ·

After examining the juror concerning his reservations about the death penalty and his ability to serve on a capital jury, the court granted the State's challenge for cause under V.T.C.A. Penal Code, Section 12.31(b), and excused the juror from service. Appellant now contends that the court erred in excusing this juror after he was impaneled and sworn, and in refusing to grant his motion for a mistrial.[2]

---

2. We note that appellant did not at trial, nor does he now, object to the court's excusing Blanchard under the authority of Section 12.-31(b), supra. Further, he does not complain that the juror was excused in violation of *Witherspoon v. Illinois*, nor did he request any opportunity to determine whether the juror was still qualified under *Witherspoon*, nor is there any showing in the record that the juror was qualified under *Witherspoon*. His sole objection at trial and on appeal is the fact that a juror was excused after having been impaneled and sworn, and that a juror has an "absolute right" to change his opinions after being selected.

We hold that the trial court did not abuse its discretion in granting the State's challenge for cause. Blanchard testified that he was not sure whether he could give the case fair and impartial consideration and that the mandatory penalty would affect his factual deliberations. The trial court determined that Blanchard was disqualified from serving, and appellant did not request to show otherwise. See *Pittman v. State,* 434 S.W.2d 352 (Tex.Cr.App.1968) (on Motion for Rehearing). We are unable to determine how appellant was harmed by the court's action. Blanchard was the second juror selected, and he was excused before any other venirepersons were examined. He heard no evidence in the case, and he was instructed by the court when he was selected not to discuss the case. We are also unable to discern how appellant was harmed by the court's failure to discharge the other juror who had already been selected. See *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978) and cases cited therein; cf. *Henriksen v. State,* 500 S.W.2d 491 (Tex. Cr.App.1973). These grounds of error are overruled.

 In a related ground of error, appellant complains of the trial court's refusal to allow him to perfect a bill of exception as to the reasons why juror Blanchard had a "change of heart" with regard to the death penalty. *After* the trial court granted the State's challenge for cause to Blanchard, appellant requested to examine him about his change in position, which the trial court denied. Appellant then perfected a bill of exception as to the questions he wanted to ask Blanchard. The bill reflects that appellant wanted to ask Blanchard (1) whether he had given false answers on Friday before he was selected or whether he had changed his mind about his position on the death penalty over the weekend; and (2) what brought about his change in position on the death penalty.

We hold that the trial court did not err in disallowing this inquiry. First, the testimony of Blanchard does contain information about why he approached the trial court with his reservations about the death penalty. The gist of his testimony is that after having been selected to sit in a capital case, he gave much thought to his previous position on capital punishment, and no longer felt sure that he believed in capital punishment. Second, to refuse to allow appellant to delve into the mental processes of the juror about why he had changed his mind did not constitute an abuse of discretion by the trial court, once it became apparent that the juror was disqualified under the statute and that appellant did not object on that basis or request an opportunity to show that he was still a qualified juror. This ground of error is overruled.

 In his ninth ground of error, appellant contends that the trial court erred in not fully and adequately inquiring into the effects on the jurors of appellant's flight from the jurisdiction. The record reflects that after a jury was selected, but before trial on the merits began, appellant forfeited his bond and left the jurisdiction. Shortly thereafter, he was apprehended in Florida and was returned.

Before proceeding with the trial, the court, at appellant's request, polled the jury individually to determine the effect, if any, of this publicity. Each juror individually stated that he or she had formed no conclusion as to appellant's guilt or innocence, and stated that he or she would base his or her verdict entirely upon the evidence and the law given in the courtroom.

After the entire questioning was finished, appellant objected "on the grounds that the questioning has not been in compliance with Article 35.16 and the true determination of any pre-trial publicity has not been made." This objection was overruled.

We hold that no error has been shown. Appellant had requested the court to poll the jury; this the court did. Appellant received exactly what he had requested; he never requested an opportunity to question the jurors himself, nor did he propose specific questions to the trial court to be asked of the jurors. His objection, *which came*

*too late and was too general*, was insufficient to preserve any complaint he might have had. Further, the trial court's actions were sufficient to adequately protect appellant's rights. See *Brown v. State*, 516 S.W.2d 145 (Tex.Cr.App.1974); *Klinedinst v. State*, 159 Tex.Cr.R. 510, 265 S.W.2d 593 (1953). This ground of error is overruled.

 Appellant next contends that the trial court erred when it denied his request to impeach Reid Hughes, an identification witness, with a composite picture which he had helped prepare previously. At trial, Reid Hughes testified that he lived down the street from the Cantrells. On the day of the murders, he observed two men in a white Monte Carlo driving around his neighborhood. He had observed the driver of the car.

On the night of the murders, after the bodies of the deceased were discovered, Hughes related what he had seen to police officers. Based upon his descriptions, a composite picture was prepared in the early morning hours. Some ten days later, he identified appellant from another picture as the driver of the car.

At trial, appellant sought to introduce into evidence the composite drawing prepared shortly after the murders were discovered, in order to impeach Hughes' identification of appellant. The trial court refused to allow this composite drawing to be introduced, ruling that it was "immaterial." We agree.

Hughes consistently testified that the composite picture which he helped prepare the night of the murders did *not* fairly and accurately represent the person he had seen driving the car. He further testified that it "wasn't close at all." The composite "was not close to the man [he] saw." He "couldn't put it all together for a composite drawing." Thus, the composite did not show a prior inconsistent identification by the witness.

Since the witness testified that the composite picture was not even close to resembling the person he had observed driving the car, it was immaterial and not probative of his pre-trial identification. Thus, the trial court did not err in refusing to allow the defense to introduce the composite into evidence to impeach Hughes. See, *Sherbert v. State*, 531 S.W.2d 636 (Tex.Cr.App.1976); *Hoffman v. State*, 514 S.W.2d 248 (Tex.Cr. App.1974); *Harrison v. State*, 495 S.W.2d 930 (Tex.Cr.App.1973). This ground of error is overruled.

In his eleventh ground of error, appellant contends that the trial court erred in overruling his request for the grand jury testimony of State's witness Ben Tabor. During the cross-examination of Tabor, the witness stated that he had reviewed his grand jury testimony before testifying at trial. The trial court reviewed the witness' grand jury testimony and ruled that appellant was not entitled to use it to cross-examine Tabor. The trial judge sealed the grand jury testimony and made it a part of the appellate record for this Court's inspection.

 The production of grand jury testimony lies within the sound discretion of the trial court and the accused may be permitted to inspect such testimony where "some special reason" exists or where a "particularized need" is shown so as to outweigh the traditional policy of grand jury secrecy. *Martin v. State*, 577 S.W.2d 490 (Tex.Cr.App.1979); *Mott v. State*, 543 S.W.2d 623 (Tex.Cr.App.1976). *Nelson v. State*, 511 S.W.2d 18 (Tex.Cr.App.1974); *Brown v. State*, 475 S.W.2d 938 (Tex.Cr. App.1971).

In the instant case, we cannot conclude that appellant has shown a "particularized need" for the grand jury testimony so as to reflect that the trial court abused its discretion in refusing to order its production. See *Mott v. State*, supra; *Brown v. State*, supra; *Martinez v. State*, 507 S.W.2d 223 (Tex.Cr.App.1974).

Further, we have examined the sealed testimony, and conclude that such testimony was entirely consistent with the witness' testimony at trial. Thus, we fail to see how appellant was harmed by the trial court's refusing to make such testimony available for cross-examination. *Mott v. State*, supra; *Brown v. State*, supra; see also *Hoff-*

man v. State, 514 S.W.2d 248 (Tex.Cr.App. 1974); Garcia v. State, 454 S.W.2d 400 (Tex. Cr.App.1970). This ground of error is overruled.

In his twelfth ground of error appellant contends that the trial court denied him his Sixth Amendment right to confrontation in refusing to allow him to cross-examine Paula Derese concerning two letters she had written.

In cross-examining Paula, the defense produced a steno pad, identified as Paula's, which contained two letters which she had written. After a hearing out of the presence of the jury, the trial court refused to allow the defense to impeach her testimony with these letters, sustaining the State's objection that the letters were immaterial. We agree that the letters were immaterial.

Several times, Paula testified that she was in love with her estranged husband, Herbie, and that she desired to reconcile with him, which was a source of conflict between her and her parents. She also denied that she had ever participated in a conversation with anyone about a murder made to look like an accidental death.

The first letter, with which appellant sought to impeach Paula, was written by Paula to Herbie, but was never mailed. In this letter, she expressed her intention to leave Herbie and her anger towards him. In the hearing out of the jury's presence, it was developed that this letter was written several years ago, when Paula and Herbie separated for one day. We hold that the trial court's ruling was correct; this old letter did not impeach her testimony that during the months before her parents were murdered, she desired to reconcile with Herbie. Thus, it was not probative of her credibility in this case, as appellant contends, and the trial court properly excluded it. It is well settled that a witness may not be impeached on immaterial and collateral matters. See Williams v. State, 542 S.W.2d 131 (Tex.Cr.App.1976); Ellard v. State, 507 S.W.2d 198 (Tex.Cr.App.1974); Fisbeck v. State, 166 Tex.Cr.R. 105, 311 S.W.2d 865 (1958).

The second letter in the steno pad was written by Paula to a previous boyfriend, Clay. In that letter, Paula made references, which she explained, to the fact that two of Herbie's relatives had been involved in a murder in Port Arthur in 1973. There was also a reference, Paula explained, to the fact that one of the perpetrator's wives turned them in, and an implication that the wife might be involved in some accident thereafter. Appellant sought to impeach her with this letter as being inconsistent with her testimony at trial that she never had knowledge of any murder that was made to look like an accidental death.

We hold that the trial court did not err in excluding this evidence. Paula testified at the hearing on this matter that she did not know when she wrote that letter. The testimony indicates it was written sometime between 1973 to 1975. Further, Paula testified that she was just recounting matters that Herbie had told her. Again, we do not find that this letter was material or probative as to any issue in the case; since a witness may not be impeached on immaterial and collateral matters, no error is shown. See Williams v. State, supra; Ellard v. State, supra; Fisbeck v. State, supra.

In a related ground of error, appellant contends that the trial court erred in not allowing him an opportunity to question Paula about the letters in the steno pad for the purposes of perfecting his bill of exception. The record reflects that this contention is without merit.

First, appellant, in a hearing out of presence of the jury, was given ample opportunity to question Paula about the letters. Further, the record reflects that he did examine her about the contents of each. Still further, the questions which appellant proposed in his bill of exception were answered by Paula during the hearing out of the jury's presence. Also, the record nowhere reflects that appellant requested to examine her further or that his examination of her was in any way limited by the trial court.

In his fourteenth ground of error, appellant contends that the trial court erred in refusing to permit him to impeach Paula for bias and motive for testifying favorably to the State. Upon cross-examination by the defense, Paula testified that she entered pleas of guilty to the murders of her parents and agreed to testify against appellant, in exchange for the dismissal of the capital murder charges against her. The defense then inquired:

"Isn't it true that you presently have held up hundreds of dollars of forged checks or hot checks with the District Attorney's office in Jefferson County, Beaumont, being held up and no charges filed on the insistence or influence of these two gentlemen right here of the District Attorney's Office of Harris County, isn't that true?"

Paula denied that this was true. The defense then asked:

"You have never forged Herbie Derese's name to any instrument, is that correct"

The State's objection to this question was sustained.

Appellant now contends that under the authority of *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) and *Castro v. State*, 562 S.W.2d 252 (Tex.Cr.App.1978), he was denied the right of effective cross-examination and confrontation of this witness. We hold that no error is shown.

The record reflects that appellant failed to perfect a bill of exception concerning any charges pending against Paula in Beaumont. The defense asked Paula about the charges; she denied them. Appellant made no attempt to show that her answers were false. He did not perfect a bill of exception in order to let the record reflect that there were, indeed, other charges pending against Paula. Absent such a showing, no error is shown. *Toler v. State*, 546 S.W.2d 290 (Tex.Cr.App.1977); *Garza v. State*, 532 S.W.2d 624 (Tex.Cr.App.1976).

In *Simmons v. State*, 548 S.W.2d 386 (Tex.Cr.App.1977), upon which appellant relies, the defendant was not permitted to develop a bill of exception concerning a witness' prior charges in his attempt to show bias towards the State. This case is inapplicable to the instant case, since here, appellant made no attempt to perfect such a bill. Further, in *Davis v. Alaska*, supra, and *Castro v. State*, supra, both defendants preserved error by letting the record reflect the matters which were excluded by the trial courts. Thus, they do not control the disposition of this ground of error. Appellant's contention is overruled.

In his sixteenth ground of error, appellant contends that the trial court erred in failing to instruct the jury that the State's witness Ben Tabor was an accomplice witness as a matter of law. Appellant has failed to preserve error on this ground. In his oral objections to the charge, appellant failed to raise this ground before the trial court. Further, his requested Charge No. 1, upon which he relies, did not deal with the issue of whether Tabor was an accomplice witness as a matter of law. Rather, the requested charge dealt with the rule regarding corroboration of accomplice witness testimony.[3] See Article 38.14, Vernon's Ann.C.C.P. Since appellant's ground of error on appeal differs from his objections raised in the trial court, nothing is preserved for review. *Sloan v. State*, 515 S.W.2d 913 (Tex.Cr.App.1974); *Campbell v. State*, 492 S.W.2d 956 (Tex.Cr.App.1973).

**3.** "Defendant's Requested Charge No. 1: Now if you believe from the evidence beyond a reasonable doubt that an offense was committed as charged, and you further believe from the evidence, or have a reasonable doubt thereof, that the witness BEN MILTON TABOR is an accomplice; you are instructed that you cannot convict the Defendant upon the testimony of the said BEN MILTON TABOR, unless you first believe that the testimony of the said BEN MILTON TABOR, is true and it shows that the Defendant is guilty as charged in the indictment, and unless you further find and believe that there is other evidence in the case outside of the said testimony of the said BEN MILTON TABOR, tending to connect the Defendant with the commission of the offense charged against him, and from all of the evidence you must believe beyond a reasonable doubt that the Defendant is guilty as charged in the indictment."

We note that the trial court did submit a charge to the jury as to whether Tabor was an accomplice witness, and charged the jury on the accomplice witness corroboration rule. See Article 38.14, supra. We direct appellant's attention to *Lafoon v. State*, 543 S.W.2d 617 (Tex.Cr.App.1976); *Jackson v. State*, 516 S.W.2d 167 (Tex.Cr.App.1974) and *Mutscher v. State*, 514 S.W.2d 905 (Tex. Cr.App.1974). This ground of error is overruled.

In his seventeenth and eighteenth grounds of error, appellant contends that the trial court erred in overruling his objections to testimony offered at the punishment phase of the trial. The record reflects that at the punishment phase, Joyce Sinclair, a former girlfriend of appellant's, testified that in February of 1976, appellant had attempted to extort money from her and had threatened her. She also testified that appellant told her of his intent and plans to murder Don Sinclair, her husband. Don Sinclair testified that he had an encounter with appellant, whom he recognized even though appellant was disguised. Appellant later told Joyce that he had intended to kill Don during this encounter, but that he was prevented from doing so by the proximity of a police officer.

Appellant objected to the admissibility of this testimony. A hearing was held out of the presence of the jury, after which the trial court overruled appellant's objections.

At the punishment phase of a capital murder trial, one of the issues which the jury must determine is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), Vernon's Ann.C.C.P. Further, this statute provides that at the punishment phase of a capital murder trial, "evidence may be presented *as to any matter* that the court deems relevant to sentence." (Emphasis added)

In *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr. App.1975), we stated that the range and severity of a capital defendant's prior criminal conduct was relevant evidence for a jury to consider in determining the likeli-

hood that the defendant would be a continuing threat to society. In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court of the United States emphasized that "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."

In *Garcia v. State*, 581 S.W.2d 168 (Tex. Cr.App.1979), and *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App.1979), we held that nothing in Article 37.071, supra, requires that there be a final conviction for an extraneous offense to be admissible at this stage of a capital trial. We stated in *Garcia* :

"Clearly, evidence of prior offenses falls within the range of 'prior criminal conduct.' Such 'prior criminal conduct' is clearly relevant to the jury's deliberations on special issue number two . . ."

See also *Hammett v. State*, supra.

Since the trial court has wide discretion in admitting evidence at the punishment phase of a capital murder trial, see *Gholson and Ross v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr. App.1977); *Brown v. State*, 554 S.W.2d 677 (Tex.Cr.App.1977), we hold that this relevant evidence of appellant's prior criminal conduct was admissible for the jury's consideration. *Garcia v. State*, supra; *Hammett v. State*, supra; see also, *Brooks v. State* (60,521, delivered March 21, 1979); *Earvin v. State*, 582 S.W.2d 794 (Tex.Cr. App.1979).

These two grounds of error are overruled.

In his final ground of error, appellant contends that the trial court erred in overruling his objection to Joyce Sinclair's testimony concerning a telephone conversation with an unidentified caller. Joyce testified that on January 6, 1976, appellant told her of his thwarted plans to kill her husband, Don. He also advised her that he had a "hit man" coming from Dallas, and then threatened her. About an hour and a

half after this telephone conversation with appellant, Joyce received another call. She did not recognize the voice, nor did the caller identify himself. Over appellant's objection, Joyce testified that the caller stated that he did not appreciate the way she was treating appellant, and said that if anything happened to appellant, he would return from Dallas and kill Joyce and her family. The caller then hung up. Shortly thereafter, appellant called Joyce and apologized for harassing her and her husband.

Appellant now contends that the court erred in allowing Joyce to testify about the conversation with the unidentified caller. Error, if there was any, in the admission of this testimony was clearly harmless in light of the substantial testimony concerning appellant's repeated threats, expressed intent to do harm to, and criminal acts toward, Joyce and Don Sinclair. See *Johnson v. State*, 548 S.W.2d 700 (Tex.Cr.App.1977); *Myre v. State*, 545 S.W.2d 820 (Tex.Cr.App. 1977); *Dalton v. State*, 516 S.W.2d 937 (Tex.Cr.App.1974). This ground of error is overruled. Appellant's pro se ground of error has already been overruled.

The judgment is affirmed.

### APPENDIX A

In the course of examining Benny Ballard, the trial court inquired:

"Q. In the past I am sure you have probably heard, read or seen something about this case.

"A. [Ballard] No, not this one.

"Q. You do not recognize this case?

"A. I wouldn't know a soul in here or anything about it?

"Q. All right. I believe that the evidence will show the additional fact that the offense, if any, happened in Baytown, Texas. And, again, I will repeat the names involved in the indictment—Vernon Eugene McManus, Paula Cantrell Derese, Paul Harvey Cantrell and Mary Bright Cantrell.

"A. Now that you mention Baytown, there was a write-up in the newspaper. It was all over the newspaper. Couldn't help but read it about this girl who was supposed to have hired somebody to murder her parents for the insurance money . . . I don't know if this is the case. I am bad on names. But I do remember that about Baytown.

"Q. . . . did you read about it, did you follow it with avid interest or just follow it with passing interest?

"A. No, I just read about it in the paper. I would go to work, and somebody would say: Did you hear about so and so.

\* \* \* \* \* \*

"Q. So, you have read something about it and you have discussed it on occasion with fellow employees or family or friends. Is that a fair statement?

"A. That would be fair.

"Q. What is the last thing you recall reading about the case?

"A. Just that they had the girl up on charges of hiring two people. That is all I remember.

"Q. Do you have any recollection or any knowledge of the present status of the Derese case.

"A. No, I don't know what has happened to the girl.

"Q. You have not read, seen or heard anything about that, then?

"A. No.

"Q. As a result of what you have read, seen or heard in the news media, or the result of any conversations you may have had in regard to the case with your fellow employees or anyone, have you formed any conclusion as to the guilt or innocence of this defendant, Vernon Eugene McManus?

"A. No, I haven't any conclusions at all.

"Q. None whatsoever. In the event that you are selected as a juror in this case, and if, during the conduct of the trial, something comes up

APPENDIX A—Continued

that my [sic] trigger your memory as to something you have read, seen or heard, I think you will admit that is a possibility?

"A. It is a possibility. I know when you said Baytown awhile ago, it clicked in my mind.—

"Q. If such a thing should happen—if something you hear at the trial of the case triggers something in your mind about anything you have read, seen or heard discussed, could you and would you set that out of your mind and let your verdict rest entirely upon the sworn testimony of witnesses in the courtroom and any physical evidence that may be admitted?

"A. That's right. I would disregard everything because I know how wrong the papers are sometimes."

The defense examined Ballard, and asked whether he had any bias or prejudice towards appellant, to which Ballard responded "I don't even know the man." Ballard also denied that there was any reason why he could not be a fair and impartial juror.

APPENDIX B

During the examination of juror Achgill, the court inquired:

"[THE COURT] Now, have you seen, read, heard or discussed anything about this case, or do you recognize the case from the names?

"A. [Achgill] From what you described in the indictment, I recognize I heard it on TV.

"Q. All right. The facts will show in this case that it also occurred in Baytown, if that is any help. But you say you have recognized some of the names and seen or heard it on TV?

"A. The part that I recognize is the insurance part of it.

"Q. That it was done for the proceeds—

"A. Yes, right.

"Q. What is the last thing you recall having seen, read or heard about the case?

"A. Well, I was sitting at home last night talking to my son, the TV was on, and it was on Channel 2, and they started saying that this case—that they were trying to pick a jury for this case and two jurors had been chosen. At that point I turned the TV off.

"Q. Thank you, sir. You are a juror that actually followed the Court's instructions. I appreciate it, and I know counsel does. All right. Then, before that, what is the last thing you recall having read, seen or heard?

"A. I couldn't even recall when I heard about it.

"Q. Does the name Paula Cantrell Derese ring a bell?

"A. No, sir.

"Q. Then I assume you don't have any idea what has happened in her case?

"A. No, sir.

"Q. Do you recall ever seeing, reading or hearing anything about this case at its inception?

"A. No, sir.

"Q. Around the middle of last year?

"A. No, sir.

"Q. All right. Well, based on what you have seen, read or heard or discussed with other people, have you formed any conclusion, however slight, as to the guilt or innocence of this defendant, Vernon Eugene McManus?

"A. No, sir. The whole thing is just a vague recollection to me. I have not formed any opinion.

"Q. Then, you have not formed any conclusion whatsoever, as to his guilt or innocence at this moment?

"A. No, sir.

"Q. Nor have you in the past?

"A. No, sir.

"Q. All right. Would you answer this, then: In the event that you were on this jury and during the course of

APPENDIX B—Continued

the trial something came up which might trigger your memory of something you have read, seen or heard, could you and would you set that aside, realizing it is the rankest hearsay, and base your verdict entirely upon the evidence and the testimony that you hear in this courtroom?

"A. Yes, sir."

PHILLIPS, Judge, dissenting.

This is an appeal from a conviction for the offense of capital murder. V.T.C.A. Penal Code, Section 19.03(a)(3). Punishment was assessed at death pursuant to Article 37.071, V.A.C.C.P.

Appellant's first ground of error complains of the trial court's failure to grant his motion to quash the indictment since it failed to adequately apprise the appellant of the capacity in which the State intended to prove he participated in the alleged murder for remuneration. The indictment, in relevant part, reads as follows:

. . . VERNON EUGENE MC MANUS . . . , heretofore on or about July 24, 1976, did then and there unlawfully intentionally and knowingly, acting as a party with Paula Cantrell Derese and other persons to the Grand Jury unknown, cause the death of Paul Harvey Cantrell by choking and strangling him with a cord and cutting him with a knife; and said murder was committed for remuneration and the promise of remuneration, namely, money from the proceeds of life insurance and the estate of Paul Harvey Cantrell and Mary Bright Cantrell. . . .

Appellant filed a motion to dismiss the indictment which alleged that the indictment was inadequate in terms of fairly apprising the appellant of the offenses he was charged with and that, in violation of the United States Constitution, the allegations were vague, indefinite, contradictory, and uncertain in advising him of the nature and cause of the accusation. A hearing was held on the motion to dismiss the indictment wherein the appellant argued that the lack of specificity in the indictment with respect to the various roles played by the various enumerated parties in the commission of the alleged capital murder hindered any preparation of a defense. It was pointed out to the trial court that the indictment failed to identify who among the enumerated parties was the promisor or promisee of the remuneration promised. V.T.C.A. Penal Code, Section 19.03(a)(3) provides that capital murder is committed when an individual is intentionally and knowingly killed by a person "for remuneration or the promise of remuneration." The indictment, as drafted, alleges only that the appellant, while acting as a party with Paula Cantrell Derese and other persons unknown, caused the death of Paul Harvey Cantrell. It is then alleged that that murder was committed for remuneration and the promise of remuneration.

This Court held in the En Banc decision of *Drumm v. State*, 560 S.W.2d 944 (Tex.Cr. App.), that the analysis to be engaged in on appeal when reviewing an allegation concerning the failure of the trial court to grant a motion to quash differs from the analysis engaged in in determining whether the pleadings were sufficient to invoke the jurisdiction of the trial court. In the latter situation, an indictment which tracks the statutory terms proscribing the conduct involved is sufficient to invoke the jurisdiction of the court. *American Plant Food Corp. v. State*, 508 S.W.2d 598 (Tex.Cr. App.). On the other hand, when a motion to quash is the subject of analysis, "fundamental constitutional protections are invoked. Because of the fundamental notions of fairness that require adequate notice of the nature of the charges against the accused in our system of justice, a timely claim of inadequate notice requires careful consideration." *Drumm*, supra, at 946.

As further stated in *Drumm*, supra, at 947:

. . . It is not for us to speculate on possible defenses; those are for the accused and counsel to investigate, prepare, and establish if they can. In order to perform that duty, however, the accused is entitled to notice of the particu-

lar cause for suspension upon which the state will rely. The accused is not required to anticipate any and all variant facts the state might hypothetically seek to establish. When the defendant petitions for sufficient notice of the state's charge by motion to quash adequately setting out the manner in which notice is deficient, the presumption of innocence coupled with his right to notice requires that he be given such notice. Appellant here was entitled to such notice and his motion to quash was sufficient to point out his need. The motion to quash should have been granted.

One's presumption of innocence and right to notice are no less when the prosecution is for capital murder, punishable by death. In fact, even more care is required in a capital case. *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978) (Roberts, J., dissenting); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

It should be clear to all that appellant, even upon timely request, was denied the right to know prior to trial *from whom* the State contends he received remuneration or a promise of remuneration. The constitutional right to know the nature and cause of the accusation against him requires that he be informed of such fact as surely as it requires that he be informed of the name of the human being he is alleged to have killed. One is as essential as the other. The indictment should have been quashed.

In his second ground of error appellant contends that the court erred in failing to grant his motion for change of venue, which was uncontroverted by the State prior to jury selection. Recently in *Henley v. State*, 576 S.W.2d 66 (Tex.Cr.App.1978), this Court wrote:

> Appellant was entitled to a change of venue if he could show, even though it would be possible to select a jury whose members were not subject to a challenge for cause, that there were influences in the community which could affect the answers on voir dire, or the testimony of witnesses at trial or that for any other reason a fair and impartial trial could not be had in Bexar County.

As will be noted upon reference to Articles 31.03 and 31.04, the trial court is vested with the responsibility of determining the "truth and sufficiency" of the affidavits alleging the grounds for a change of venue and when an issue is formed as to those grounds by the filing of controverting affidavits, that issue "shall be tried by the judge, and the motion granted or refused, as the law and facts shall warrant." As already demonstrated, the issues raised by the motion to change venue affidavits cannot be fully and adequately tried through the more narrow jury voir dire procedure. See Article 35.16, Sections 8 and 9, V.A.C.C.P. Further, the trial court's denial of a defendant's motion for a change of venue, without allowing the defendant an opportunity to present evidence in support of his motion, was expressly condemned by this Court in *Burleson v. State*, 131 Tex. Cr.R. 576, 100 S.W.2d 1019. The dissent admits that the trial court failed to comport with "accepted procedure," but seeks to excuse the omission by analogy. The analogy to the trial court's discretion in regulating trial procedure vis-a-vis evidentiary rulings and the perfecting of a bill of error with respect thereto ignores a fundamental distinction between the questions involved. The dissent's analogy presupposes the propriety of conducting the trial. The procedure demanded of the trial court under Chapter 31, V.A.C. C.P., is for the threshold issue of whether a trial should be conducted in the county involved. The timing of the Chapter 31 hearing is critical. It is no less mandatory a statute for its failure to expressly designate the precise timing for a hearing. To argue that the inquiry mandated by Chapter 31 could be just as efficaciously conducted in a hearing on a motion for new trial is to ignore the venue issue's threshold nature. It is indeed putting the horse behind the cart. . . .

*Id.* at 72.

In the instant case, the motion to change venue was uncontroverted before the jury voir dire commenced and the trial court was

well aware of the motion. The same policy consideration underlying the *Henley* opinion, i. e., the delayed timing of the factual inquiry, applies here as well. Only after the jury was impaneled and sworn was any factual inquiry on the motion to change venue conducted.[1] The voir dire in this trial lasted 30 days and consumes 5,337 pages of this record. Considerable energy and resources were already committed to the trial of this case before the critical threshold issue was ever heard.

This Court has examined on several occasions when a defendant is required to present his motion for change of venue.

In *Devereaux v. State*, 473 S.W.2d 525 (Tex.Cr.App.), the defendant filed his motion for change of venue prior to voir dire. The motion was never urged to the trial court and the defendant's counsel indicated to the court the matter would not be pursued. Subsequently, the defendant announced ready for trial and began voir dire examination of the jury panel. At the conclusion of voir dire, the defendant's motion for change of venue was mentioned to the court. The trial court then denied the motion as being untimely presented. This Court upheld the trial court's decision quoting Article 28.01, V.A.C.C.P.[2]

In *Mirick v. State*, 83 Tex.Cr.R. 388, 204 S.W. 222, the defendant made a motion for change of venue after nine jurors had been selected and sworn. The State controverted the motion and demurred on the grounds that the motion was presented too late. The trial court overruled the defendant's motion and this Court upheld such ruling.

These cases stand for the proposition that a motion for change of venue must be presented before trial, i. e., prior to jury selection. This determination is consonant with the very reasons for a change of venue. If there exists such an air of popular sentiment against an accused as to prevent a fair and impartial trial, a change of venue is necessary. That this matter must be placed in issue prior to voir dire stems from the very nature of community sentiment. If there exists in a community a pervasive prejudice against a defendant, an individual venireman may not be aware of such feeling on his part. As was noted in *Faulkner v. State*, 43 Tex.Cr.R. 311, 65 S.W. 1093: "Prejudice is a sinister quality. It may possess a man and he not be aware of it; . . ." This statement points up the problem of determining prejudice on voir dire. News coverage may be so widespread and extensive that the answers elicited by counsel on voir dire may not reflect the subconscious prejudice prevalent in the community resulting from such coverage. Because of the insidious nature of prejudicial community sentiment and the ineffectiveness of voir dire as a means for determining this sentiment, it is essential that the component issues of Article 31.03, supra, be joined and, to the extent possible, resolved prior to voir dire.

In the instant case the appellant was never allowed to present any evidence on his motion *prior to* the voir dire of the jury panel, and the trial court "carried along" an uncontroverted motion to change venue which presented no evidentiary issues for the court to rule on.

The hearing of evidence on a motion for change of venue is a factual trial of the constitutionally critical issue of whether the defendant is to be tried in an atmosphere undisturbed by public passion. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In a concurring opinion Mr. Justice Frankfurter summed it up as follows:

(7) Motions for change of venue by the State or the defendant; provided, however, that such motions for change of venue, if overruled at the pre-trial hearing, may be renewed by the State or the defendant during the voir dire examination of the jury; . . . ."

1. Jeopardy attaches when the jury is impaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978).

2. Article 28.01, V.A.C.C.P., Section 1, provides, in part:
 Section 1. . . . The pre-trial hearing shall be to determine any of the following matters: . . .

. . . This Court has not yet decided that the fair administration of criminal justice must be subordinated to another safeguard of our constitutional system—freedom of the press, properly conceived. The Court has not yet decided that, while convictions must be reversed and miscarriages of justice result because the minds of jurors or potential jurors were poisoned, the poisoner is constitutionally protected in plying his trade. *Id.*, 366 U.S. at 730, 81 S.Ct. at 1647. In deciding this vital issue great discretion is reposed in a trial judge. *Ward v. State*, 427 S.W.2d 876 (Tex.Cr.App.); *James v. State*, 546 S.W.2d 306 (Tex.Cr.App.). His finding of fact thereon is not reviewable by a jury; and if there exists any conflict in the evidence on said issue, his decision has generally been held to be binding upon this Court. *Chappell v. State*, 519 S.W.2d 453 (Tex.Cr.App.). Such a delicate and generally irreversible decision should be made by the trial judge without having the balance weighted against the defendant by the actual swearing in of a jury to try the defendant, with its attendant attachment of jeopardy, before permitting the defendant to offer any evidence on said issue and before the judge's decision thereon. Our statutes and unbroken line of decisions give the defendant this right. An arbitrary denial of such right, notwithstanding the defendant's demand therefor, is a denial to him of the benefits of the law of the land, and thus, due process of law. Such a denial involves such a possibility of prejudice to the defendant's right to a factual determination of such critical issue, *apart from any other consideration*, that such arbitrary procedure is inherently lacking in due process without a showing of identifiable prejudice. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

We should hold that an arbitrary denial of a defendant's asserted right under the law of this State to present evidence in support of said issue and secure a decision by the trial judge on a motion for change of venue prior to the trial judge's swearing in of a jury to try the defendant is prejudicial error. The majority's holding that a trial judge may hereafter arbitrarily refuse a defendant his statutory and constitutional right to be heard on a motion for change of venue until after he has, for all practical purposes, foreclosed the issue by swearing in a jury to try the case is a denial to a defendant of the fundamentals of due process of law.

The decision on the motion to change venue must be made prior to voir dire, keeping in mind that the motion can be *reurged* during voir dire. Article 28.01, V.A.C.C.P. This threshold issue must be decided before jeopardy attaches.

Appellant also complains that at the punishment phase the State was permitted to introduce testimony over objection that appellant committed five other extraneous offenses for which he was never tried or convicted.

Article 37.07, V.A.C.C.P., specifically provides as follows:

Article 37.07 Verdict Must be General; Separate Hearing on Proper Punishment

Sec. 3. Evidence of a prior criminal record *in all criminal cases* after a finding of guilty.

(a) Regardless of the plea and whether *the punishment be assessed by the judge or the jury*, evidence may be offered by the state and the defendant as to the prior criminal record of the defendant, his general reputation and his character. The term prior criminal record means a final conviction in a court of record, or a probated or suspended sentence that has occurred prior to trial, or any final conviction *material to the offense charged*. [Emphasis added]

The admission of this testimony about five extraneous offenses that had not resulted in final convictions violated the clear prohibition of Article 37.07(3)(a). This statute expressly applies "in all criminal cases." It makes no exception for capital murder cases. Other provisions of the Code of Criminal Procedure plainly show that when the Legislature wants a different rule to apply to capital cases, it expressly creates

an exception. See, for example, Article 1.07, Article 1.14, Article 1.141, Article 35.-17, Article 42.04, Article 42.12(15), Article 44.08, Article 44.09, and Article 44.35. Since the Legislature made no exception for capital cases in Article 37.07(3)(a), the inescapable conclusion is that this provision applies to capital as well as noncapital cases.

Article 37.07(3)(a) reflects a Legislative determination that evidence of prior criminal conduct not resulting in a final conviction is insufficiently reliable to be considered in sentencing. Unadjudicated extraneous offenses are no less relevant to sentencing in noncapital cases than they are to sentencing in capital cases. It is inconceivable that the Legislature would deem such evidence too unreliable to be considered in a noncapital sentencing decision, but at the same time allow such evidence to be considered in a sentencing decision where a person's life is at stake.

Arguably, an unadjudicated extraneous offense that is proven beyond a reasonable doubt is sufficiently reliable to be considered in any sentencing decision. Although we may disagree with the Legislature's determination that such evidence is inadmissible, it is not the role of the Judiciary to pass judgment on the wisdom of the Legislature's actions. It is certainly within the power of the Legislature to exclude evidence of prior criminal conduct not resulting in a final conviction from consideration in the sentencing decision *in all criminal cases.* Article 37.07 makes it clear that the Legislature has chosen to do so.

This Court has held in *Hammett v. State,* 578 S.W.2d 699 (Tex.Cr.App.1979), and *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App. 1979), that Article 37.071 creates an exception to the seemingly total prohibition of Article 37.07(3)(a); therefore, Article 37.071 permits the admission of unadjudicated extraneous offenses at the punishment phase of a capital murder trial. In both cases I concurred in the judgment upholding the death sentence, but upon further consideration I am convinced that the Court's holding in both cases was clearly wrong.

. There are three reasons, besides the express language in Article 37.07(3)(a) that it applies "in all criminal cases," why Article 37.071 fails to evidence a Legislative intent to create an exception to Article 37.07(3)(a). First, the only purpose of the Article 37.071 provision that "evidence may be presented as to any matter that the court deems relevant to sentence" was to prevent the anticipated constitutional infirmity of denying a defendant's right to present mitigating circumstances at the capital sentencing hearing. See *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). To infer from this provision a Legislative intent to create an exception to Article 37.07(3)(a) is to impute an intent to the Legislature that was clearly nonexistent.

Second, Article 37.07(3)(a) is a *specific* statute dealing with the admissibility of a defendant's prior criminal record at a sentencing hearing "in all criminal cases." Article 37.071, on the other hand, is a *general* statute with respect to the admissibility of this type of evidence. It is well established that when two statutes appear to conflict, the specific statute controls over the general one.

Third, Article 37.071 deals with the scope of *relevance* at the punishment phase of a capital murder trial. No one would question that unadjudicated extraneous offenses are relevant to the issue of punishment in all criminal cases. This Court held in *Porter v. State,* 578 S.W.2d 742 (Tex.Cr.App. 1979), however, that relevant evidence must be excluded at the punishment phase of a capital murder trial when its admission violates a rule of evidence.

It is true that the trial court at the punishment phase of a capital murder trial has wide discretion in admitting or excluding evidence. . . . However, this discretion extends only to the question of the relevance of the facts sought to be proved. Article 37.071(a), *supra,* does not alter the rules of evidence insofar as the manner of proof is concerned. *Porter v. State,* 578 S.W.2d at 748. The hearsay evidence admitted in *Porter* was highly relevant, but this Court reversed the

conviction because the admission of this hearsay violated a rule of evidence. Analogously, in the present case these five unadjudicated extraneous offenses, if they occurred as testified to, were relevant to the sentencing decision. But Article 37.07(3)(a) constitutes a legislatively-created rule of evidence barring evidence of unadjudicated extraneous offenses at the sentencing hearing *in all criminal cases.* When Article 37.07(3)(a) and *Porter* are read together, it should be clear that the testimony about five extraneous offenses was inadmissible. This testimony, though relevant under Article 37.071, violated a rule of evidence, namely Article 37.07(3)(a); therefore, under the rule this Court announced in *Porter,* this testimony was inadmissible.

In both *Hammett* and *Garcia* the arguments for allowing evidence of unadjudicated extraneous offenses seem superficially persuasive. Upon closer examination, however, this apparent persuasiveness evaporates.

I note at the outset that neither *Hammett* nor *Garcia* addressed the express language of Article 37.07(3)(a) that it applies "in all criminal cases." Understandably so, because any response would reveal this Court's blatant disregard for the Legislature's authority.

Both *Hammett* and *Garcia* emphasize the Supreme Court's statement in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), that "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." Both cases intimate that there is a constitutional infirmity in excluding any relevant information at a capital sentencing hearing. This statement in *Jurek,* however, did not deter this Court from holding in *Porter* that relevant evidence must be excluded when its admission violates a rule of evidence. Our holding in *Porter* was consistent with another concern of the Supreme Court in capital cases, namely that the sentencing decision be based on reliable information. See *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Gardner*

*v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

There is no constitutional infirmity in the Legislature's decision to apply Article 37.-07(3)(a) to capital murder cases. Consonant with the Supreme Court's decisions, the Texas Legislature has the prerogative to enact a law excluding from consideration in capital sentencing decisions relevant evidence that it deems unreliable. In enacting Article 37.07(3)(a), the Legislature exercised this prerogative.

Both *Hammett* and *Garcia* state that "[n]othing in Article 37.071 . . . requires that there be a final conviction for an extraneous offense to be admissible at the punishment phase." This is true, but it conveniently ignores that there is such a requirement in Article 37.07(3)(a). Furthermore, there is nothing in Article 37.071 requiring that evidence at the punishment phase not be hearsay; nevertheless, we held in *Porter* that hearsay is inadmissible.

Finally, *Hammett* and *Garcia* rely on statements this Court made in *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App.1975), in the course of discussing Article 37.071.

In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct.

In light of the long-established rule that unadjudicated extraneous offenses are inadmissible at sentencing hearings, the most reasonable interpretation of this language is that "the range and severity of his prior criminal conduct" merely refers to criminal conduct resulting in a final conviction. If this Court in *Jurek* intended to overrule Article 37.07(3)(a) insofar as it applies to capital murder cases, it would have used express language to do so. It is unreasonable to infer from such cursory treatment that this Court intended to do something as drastic as overruling an act of the Legislature.

In *Rumbaugh v. State,* 589 S.W.2d 414 (Tex.Cr.App.1979), the Court indulges in some ill-considered dicta concerning the re-

lationship between Article 37.07(3)(a) and Article 37.071. The Court concludes that the Legislature intended to allow admission of unadjudicated extraneous offenses at the punishment phase of a capital murder trial. The basic fallacy in the Court's reasoning is its assumption that Article 37.07(3)(a) applies only to noncapital cases. This ignores the express language of Article 37.07(3)(a) that it applies "in all criminal cases."

> The Court in *Rumbaugh* wrote as follows: Had [the Legislature] wanted to limit the proof in capital trials to adjudicated offenses, it could have provided so in Article 37.071, as it has in Article 37.07. There being nothing in Article 37.071 to require such a limitation, this Court cannot impose it.

Since the Legislature made Article 37.07(3)(a) applicable "in all criminal cases," it is unreasonable to expect the Legislature gratuitously to restate this rule of evidence in Article 37.071. What *Rumbaugh* should have said was: There being nothing in Article 37.071 to create an exception to Article 37.07(3)(a), this Court *cannot* impose it.

The thrust of *Rumbaugh's* argument is that the Legislature's choice of a bifurcated procedure in capital cases evidences its intent to permit proof of unadjudicated extraneous offenses at the punishment phase. There is nothing to support this argument. The Legislature chose a bifurcated procedure in capital cases just as it chose such a procedure in noncapital cases. No one seriously would contend that the Legislature's choice of a bifurcated procedure in noncapital cases demonstrates its intent to permit proof of unadjudicated extraneous offenses at the punishment phase of a noncapital trial. All acknowledge that in such a situation Article 37.07(3)(a) manifests the Legislature's intent to limit proof of extraneous offenses to those resulting in a final conviction.

There is no basis for inferring a different intent in capital cases. The choice of a bifurcated procedure in capital cases, together with Article 37.07(3)(a), evidences a Legislative intent to limit proof of extraneous offenses at capital sentencing hearings to those resulting in a final conviction.

I would construe Article 37.07(3)(a) to apply in scope exactly as the Legislature specifically stated it to apply, *in all criminal cases.* To the extent that the following cases permit evidence at a capital sentencing hearing of prior criminal conduct not resulting in a final conviction, they should be overruled: *Hammett v. State,* 578 S.W.2d 699 (Tex.Cr.App.1979); *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App.1979); *Wilder v. State,* 583 S.W.2d 349 (Tex.Cr.App.1979); *Rumbaugh v. State,* 589 S.W.2d 414 (Tex.Cr.App.1979); *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App.1979).

For the above reasons, the judgment and sentence should be reversed.

CLINTON, Judge, dissenting.

Elsewhere I have expressed the view that an indictment is sufficient to withstand an exception to form contemplated by Article 27.09, V.A.C.C.P.—that is, as required by Article 21.02, *id., inter alia,* the offense is alleged "in plain and intelligible words"—*if* it includes the requisite "element of offense" requirements of V.T.C.A. Penal Code, § 1.07(a) and tracks the broad statutory statement of the offense, incorporating a description of the prescribed method or manner by which the underlying facts suggest the offense was committed.[1] Accordingly, had the indictment in this case been drawn in terms of the statutorily stated element that enhances a killing to the capital offense of murder for hire or hire to murder, I would not be writing at all in this case—nor even participating—for it was submitted in 1978.[2] But, the drafter of the

---

1. See generally *Minix v. State,* 579 S.W.2d 466 (Tex.Cr.App.1979) (Dissenting opinion on State's motion for rehearing). (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

2. Generally I have been reluctant to participate in En Banc decisions in causes presented to the Court before I became a member. Here, however, the issue on which I write is purely one of construction of the written indictment, and that I did not hear oral argument on it is really of

indictment did not follow the critical statutory language and, in failing to do so, in my judgment, the plain and intelligible words of the statute were converted into an ambiguous and uncertain phrase that constitutes the very heart of the allegation.

Concisely, the scrivener converted the transitive verb "commits" in the statutory phrase "commits the murder" to an intransitive verb "committed" in the indictment phrase "murder was committed."

Elaborating on the proposition, a standard meaning of the transitive verb commit is "to do or perpetrate, as an offense or crime." Thus the statute denounces the person who intentionally or knowingly causes the death of another *and* "commits the murder" for hire. Here, then, had the indictment clearly alleged that appellant did ". . . cause the death of Paul Harvey Cantrell by choking and strangling him with a cord and cutting him with a knife; and committed the murder for remuneration and the promise of remuneration . ." it would have truly tracked the statute and clearly been sufficient.[3] However, what was actually alleged is that appellant ". . . did then and there . . . *cause* the death of Paul Harvey Cantrell by choking and strangling him with a cord and cutting him with a knife; and *said murder was committed* for remuneration . . ." This departure from the statutory track immediately introduces some degree of vagueness, but when coupled with common usage of the word "cause" as in "cause the death" of the victim—to "bring about; effect" not necessarily by one's own hand—the indictment no longer clearly alleges that appellant, himself, committed murder and committed it for remuneration or the promise of remuneration. Rather, it may easily be read to mean that in some culpable manner *other than by his own hand* appellant brought about the death of the victim by hiring the murderer.

Inserting the "party" allegation further compounds the otherwise already indefinite language set forth. Thus it is said that appellant was "acting as a party with Paula Cantrell Derese and other persons to the Grand Jury unknown" in causing the death of the victim. Unless we are permitted to assume—and assuredly in a capital murder case we should not lightly so assume—the indictment may now be read as reporting that some unknown person, by choking and strangling the victim and cutting him with a knife, thereby caused death, and did so for remuneration and the promise of remuneration. In this light, appellant is charged with directly hiring, or being a party to hiring, for murder rather than murdering for hire.

Furthermore, by using "committed" as an intransitive verb in the past tense the draftsman fails to identify recipient of the remuneration or the promisee of it.

One can find other faults, but enough has been seen and explicated by me to conclude that the alleged offense is not set forth in plain and intelligible words. Therefore, I believe that the judgment should be reversed and the cause remanded for a new trial.[4] Accordingly, I respectfully dissent.

ROBERTS, J., joins.

---

little moment. My part in this cause, though, is limited to this ground of error.

**3.** See 7 Texas Practice 34, Morrison & Blackwell, Criminal Forms §. 4.06; McClung, Jury Charges for Texas Criminal Practice 293–294. Compare 2 Texas Annotated Penal Statutes

With Forms (Branch's 3rd Edition) 17, para. (c).

**4.** Being a matter of form, pursuant to Article 28.10, V.A.C.C.P., the indictment may be amended at any time before announcement for the new trial that should be ordered.