**Amos Lee JONES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57,103.**

Court of Criminal Appeals of Texas, Panel No. 1.

June 13, 1979.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

John P. Knouse, Dallas, for appellant.

Henry M. Wade, Dist. Atty., William M. Lamb, Norman Kinne and Rider Scott, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and ROBERTS and W. C. DAVIS, JJ.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for murder. The indictment alleged that appellant did "then and there, intending to cause serious bodily injury to an individual, Mary McCasland, commit an act clearly dangerous to human life, to-wit: did then and there intentionally strike the said Mary McCasland with a brick, thereby causing the death of said Mary McCasland . ." A jury found appellant guilty and assessed his punishment at 99 years in the Texas Department of Corrections.

In two grounds of error, appellant challenges the sufficiency of the evidence to sustain the conviction. He first contends that the evidence is insufficient to show that appellant was the deceased's assailant.

At trial, Dallas Police Officer J. L. Morgan testified that in the early morning of August 16, 1975, he was on patrol. He received a radio dispatch and went to a residence. He observed the deceased, a sixty-five to sixty-six year old woman, sitting, wearing only a towel. He testified that she had a large laceration on her upper chest, a large bruise and laceration on her right cheek, and a large laceration on the top of her head. She was unable to walk and was very upset and excited. He testified, without objection, that she related to him that late that evening a young black male had knocked at her door and said that "Tammy" (later shown to be a neighbor) had sent him to borrow some baking soda, and that he was Tammy's cousin. The deceased related

that she got the baking soda and stuck it through the door to give to him, when he grabbed her and forced his way inside. According to the deceased, the assailant threatened to kill her, and then struck her three times on the chest, face, and head with a brick. She related that she was knocked down, but then got up, and the assailant knocked her down again. After locking the front door, the assailant had knocked her down again and got a long kitchen fork out of the kitchen and held it on her. After shoving her to the floor again, according to the deceased, the assailant tore her clothes off and took his own clothing off; he then got a jar of Vaseline petroleum jelly from somewhere in the house, lubricated his penis, and raped her on the floor of the hallway. Officer Morgan testified that the deceased related that the assailant then demanded and took money from her, and then shoved her into a bedroom closet and pushed a large water cooler fan in front of the door. The deceased related that she lost consciousness for a while, and then forced the closet door open and crawled into the kitchen to call for help.

Officer Morgan testified that the deceased related that she did not know her assailant, but that he was a black male, about sixteen years old, about 5'10" tall, weighing about 160 pounds, clean shaven, with braided hair, wearing a tight chain around his neck with a cross on it. Officer Morgan testified that he observed blood on the floor in the hallway and by the front door. A jar of Vaseline, with the lid next to it, was found on the floor in the kitchen next to the hallway. The deceased was taken to the hospital, where she later died. Four fingerprints were taken at the scene, three of which were later identified as appellant's.

Tammy Paul, sixteen years old, testified that she was a neighbor of the deceased, living down the street. She further testified that she had known appellant for a while, and that he had been to her house on various occasions. She stated that after she heard a partial description of the assailant who attacked the deceased she realized that it fit the description of appellant, and she related this to a neighbor. She further stated that on August 16th appellant's hair was braided and he wore a necklace. Upon cross-examination, she stated that the description of the assailant's height and weight did not match that of appellant.

Beatrice Johnson, another neighbor of the deceased, testified that she had seen appellant in the neighborhood before. She testified that on August 16th appellant's hair was braided, but that on August 17th the braids were combed out.

Police Officer D. J. McDonald testified that on the basis of information received he obtained an arrest warrant for appellant. He stated that he looked for appellant numerous times.

Police Officer R. A. Hight testified that on November 10, 1975, he went to appellant's residence and was admitted by his grandmother. He testified that he found appellant in a bedroom, hiding behind a bed, and arrested him. In his police arrest report, Officer Hight had reported that appellant was 5'6" tall, weighed 125 pounds, and at that time had a full Afro haircut and a mustache.

Helen Simpson, appellant's grandmother, testified later during the trial, and stated that immediately prior to appellant's arrest he had been missing for a month, and that no one knew where he had been. She further testified that on the date of the arrest, when the officers knocked at the door of the residence, appellant ran into the bedroom and hid behind the bed.

Dr. Norman Grant testified that he does examinations of rape victims at Parkland Hospital. He testified from the report of the doctor who examined the deceased and related that the deceased was found to have had severe injuries to her genitals. He further stated that motile sperm was found in her vagina.

Sarah Williams from the Southwest Institute of Forensic Science testified that she examined a vaginal smear of seminal fluid taken from the deceased. She determined that the seminal fluid was from a person

who had type O blood and was a secreter. She further stated that she took a saliva sample from appellant and determined that he had type O blood and was a secreter. Therefore, the results of the two tests she conducted were consistent. She also testified that 34% of black males are secreters with blood type O.

Retired Police Officer J. C. Day testified that he had been assigned to the fingerprint bureau of the Dallas Police Department. He examined the four fingerprints taken from the scene of the offense. He testified that he could identify a print taken from the Vaseline jar found at the scene as belonging to appellant; he could further identify a fingerprint and a palm print, both taken from the water cooler fan in the deceased's home, as also belonging to appellant. The fourth fingerprint, taken from a kitchen counter top, was not appellant's.

The defense presented witnesses who testified that appellant was not the height or weight of the assailant as described by the deceased. However, one witness testified that appellant always wore a necklace chain and that his hair was sometimes braided. Another witness testified that appellant did not wear a cross. The defense also presented the testimony of a private fingerprint examiner, who stated that the fourth fingerprint found on the counter top in the deceased's house was not that of appellant, and that it was possibly that of another young black male.

Appellant testified in his own behalf and presented a defense of alibi. He testified that he knew Tammy Paul and that he had been to her house frequently. He testified that four days prior to the offense he had been in the deceased's home, which was why his fingerprints were found there. He stated that he had needed money, and that he swept around her dog pen, after which she paid him. He testified that he had then asked to use her telephone and that she allowed him to come into her house. He stated that the telephone was in the hallway, sitting on top of the water cooler fan. He further stated that various other items sat on top of the water cooler fan, but that he did not know if there had been a Vaseline jar there also. He testified he touched the water cooler fan while using the telephone. Upon cross-examination, he stated that shoes he wore increased his height a few inches.

Upon rebuttal, the State called Melody McCasland, daughter-in-law of the deceased. She testified that the water cooler fan in the deceased's house was moved from room to room, and that the deceased never sat anything on top of it, nor was it ever used as a shelf for things. She further testified that the telephone cord would not reach out into the hallway; further, the telephone was across the bedroom from the hallway, and it would have been impossible for it to have reached out into the hallway. She testified that the deceased kept a jar of Vaseline in her house but that it was kept in the bedroom or bathroom.

■ Upon review by this Court, the evidence must be viewed in light most favorable to the jury's verdict. *Seaton v. State*, 564 S.W.2d 721 (Tex.Cr.App.1978); *Rogers v. State*, 550 S.W.2d 78 (Tex.Cr.App. 1977); *Clark v. State*, 543 S.W.2d 125 (Tex. Cr.App.1976). We hold that the circumstantial evidence is sufficient to support the jury's finding that appellant was the assailant of the deceased. While the physical description given by the deceased did not perfectly match that of appellant, there were certainly many similarities. Appellant was the same age as the assailant was estimated to have been. The assailant was described as taller and heavier than appellant; however, the evidence showed that the deceased was a 65 to 66 year old woman who was only 4'11" tall, who had suffered an extremely brutal and vicious attack. The deceased had serious injuries and was very upset and excited after the attack. Thus, the jury might well have concluded that she overestimated the size of her attacker. Further, according to appellant's own testimony, he sometimes wore shoes which elevated his height several inches. The assailant was described as having braided hair; appellant had worn his hair braided, until the day after the offense was

committed, when he unbraided it. The assailant was said to have worn a necklace; testimony showed that appellant wore a chain necklace. Appellant was shown to have disappeared for a month prior to his arrest, and no one, including his relatives, knew where he was. When the police officers arrived at his grandmother's residence, he ran into the bedroom and hid from them, between the wall and the bed. Appellant was shown to have the same blood type and secreter factor as the attacker who raped the deceased. The evidence indicated that the assailant had touched the Vaseline jar and the water cooler fan in the deceased's house. The strongest evidence introduced showed that appellant's fingerprints were found in three places in the deceased's house, in two places on the water cooler fan and on the Vaseline jar found on the floor next to the hallway.

Appellant testified to an alibi defense; however, no other witnesses corroborated this. He offered an explanation of how his fingerprints came to be on the water cooler fan. However, the testimony of the deceased's daughter-in-law, who was familiar with her house, was that neither the telephone nor anything else was ever placed on top of the water cooler fan, and that the telephone could not have reached to the top of the fan in the hallway as appellant said it had. Appellant offered no explanation as to why his fingerprint was found on the jar of Vaseline. Considering the record as a whole and viewing it in the light most favorable to the verdict, we find the circumstantial evidence sufficient to support the conviction. This ground of error is overruled.

In his second ground of error, appellant contends that the evidence is insufficient to show that the injuries inflicted upon the deceased during the attack were the cause of her death.

Dr. David Ammons testified that he saw the deceased on August 16th, after she was admitted to Parkland Hospital. He testified as to her injuries when she was admitted to the hospital, to the deterioration of her condition during the following weeks,

and to the cause of her death, which occurred on September 1, 1975. When admitted to the hospital, the deceased had multiple contusions, bruises and lacerations over her face, scalp, chest, thigh and knee; she also had a fractured pelvis and a mild concussion. It was determined also that the deceased had a diabetic condition. It was also determined that she may have had an aspiration pneumonia, a chemical pneumonia caused by the aspiration of vomit into the lungs. She subsequently developed "hospital-acquired pneumonia," since the chemical pneumonia made her lungs susceptible to a bacterial invasion. Her condition steadily worsened during her hospitalization. Along with respiratory failure, she developed renal failure, possibly caused by her hypertensive episode or shock. From her pneumonia, she also developed sepsis, which is a total body infection. This led to some gangrene in her extremities. She "had a progressive downhill course from several hours after she was admitted." Her injuries at the time of her admission to the hospital were consistent with having been struck with a brick with great force.

Dr. Ammons testified that the act of striking someone with a brick is an act clearly dangerous to human life and an act which would, in all probability, cause serious bodily injury. He further testified that a few hours after her admission the deceased went into very severe shock, partly caused by the internal bleeding due to the fractured pelvis. He stated that she had told doctors that she had been unconscious for a period of time and that she had vomited twice. He testified, however, that he had no way of knowing if the chemical pneumonia was caused from an aspiration of the gastric contents if she vomited while unconscious. However, he thought that this was a possibility.

The prosecutor asked:

"Q. Now, is it your opinion that although the cause of death at the time that she actually died, that you could write it down and say well, she died of pneumonia, would that be right?

"A. [Dr. Ammons] She died of complications of pneumonia.

"Q. [Prosecutor] Complications?

"A. That's right . . .

\*　\*　\*　\*　\*　\*

"Q. But when you trace it all back, it all goes back to this beating, does it not?

"A. I think that that's very reasonable to say that the whole course of events that ultimately led to her death on September the 1st began when she was beaten and sustained multiple injuries that caused her body defenses and reflexes and things to be knocked out of whack so that she just could not tolerate [the trauma] . . . Some people live and are able to—we can tide them over until their body defenses and things come back around, but she couldn't.

\*　\*　\*　\*　\*　\*

"Q. *In your opinion—well, would it be fair to say but for being beaten with a brick, she wouldn't have suffered all these other things before she died?*

"A. *I think that that's very reasonable to say that, yes, definitely, all of her problems stemmed from being beaten with a brick.*" (Emphasis added)

Dr. Ammons further testified unequivocably that the trauma which the deceased sustained was a lethal injury to her.

We hold that the evidence is sufficient to prove that the acts of appellant in beating the deceased caused her death. V.T.C.A. Penal Code, Section 6.04(a), provides:

"A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient."

In *Turner v. State*, 505 S.W.2d 558 (Tex.Cr. App.1974), we were confronted with a situation where the defendant had shot the deceased, who, while hospitalized, developed pneumonia and died. In holding that the evidence was sufficient to show that the defendant caused this death, we quoted:

"If a wound causes a disease which produces death and there is no evidence of gross neglect or improper treatment, the death is imputable to the wound." 4 Branch's Ann.P.C., 2d ed., Sec. 2033, p. 345.

In *Wilson v. State*, 136 Tex.Cr.R. 590, 126 S.W.2d 977 (1939), the deceased died as a result of pneumonia, which we held was caused by the defendant's infliction of injuries upon the deceased. We quoted from *Powell v. State*, 13 Tex.App. 244 (1882):

"It is an ancient and well settled principle of the law of homicides that if a wound causes a disease which produces death, the death is imputable to the wound."

In *Wright v. State*, 388 S.W.2d 703 (Tex.Cr. App.1965), it was held that if the act of the defendant alleged in the indictment contributed to the death of the deceased, he is responsible, although there may have been concurring causes. See also, *Knight v. State*, 538 S.W.2d 101 (Tex.Cr.App.1975); *Gonzales v. State*, 505 S.W.2d 819 (Tex.Cr. App.1974).

■ In the instant case, Dr. Ammons testified that the deceased died of complications of pneumonia, all of which were traceable to the injuries she sustained during the beating. Further, he testified that all of the medical problems which he related stemmed from the beating she sustained. We hold that the evidence is sufficient to show that the beating inflicted by appellant upon the deceased was the cause of all of the complications the deceased suffered which eventually caused her death. This ground of error is overruled.

In his third ground of error, appellant contends that the trial court erred in overruling his objection to the prosecutor's argument outside the record during final arguments. The argument centered around a fingerprint found in the home of the deceased which the evidence showed was not that of appellant.

The prosecutor argued:

"State's Exhibit Number 11 is not the defendant's fingerprint, we'll admit that to you, it's not his fingerprint. And Mr. Miller [defense counsel] says the District Attorney's Office hasn't done anything with this fingerprint. What would he have me do with this fingerprint? Compare it with the millions that are on file in the Central Office of the Federal Bureau of Investigation and see if it comes out to be anybody's? I'll tell you right now that's not possible.

"MR. MILLER: Objection, Your Honor, that's outside the record and the District Attorney's personal opinion—

"MR. KINNE [Prosecutor] (interposing) Well, I'm just answering what he said.

"THE COURT: He has a right to answer your argument."

The record reflects that defense counsel had previously argued to the jury:

"The fingerprints, now, they only matched one, they never made any attempt to match State's Exhibit Number 11 with anybody in the world . . .

\* \* \* \* \* \*

"[F]ingerprints that the District Attorney has never, and God knows why, has never done anything with except say 'they are unidentified,' that's all, that's all they have done."

■■ The arguments by both parties as to what could or could not be done with the unidentified fingerprint were outside the record. Appellant is correct that it is improper for the prosecution, in argument, to refer to matters outside the record. *Alejandro v. State*, 493 S.W.2d 230 (Tex.Cr. App.1973). However, in the instant case, the prosecutor's argument was invited by defense counsel. *Hefley v. State*, 489 S.W.2d 115 (Tex.Cr.App.1973); see also *Jones v. State*, 520 S.W.2d 755 (Tex.Cr.App. 1975); *Allen v. State*, 513 S.W.2d 556 (Tex. Cr.App.1974). If an argument is invited, then it is not improper and, therefore, does not constitute error. *Hill v. State*, 518 S.W.2d 810 (Tex.Cr.App.1975). See also, *Landers v. State*, 550 S.W.2d 272 (Tex.Cr. App.1977). No error is shown.

The judgment is affirmed.