**Wilburn H. WHITEHEAD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09 85 080 CR.**

Court of Appeals of Texas,
Beaumont.

April 11, 1986.

Petition for Discretionary Review
May 29, 1986.

**646**

Louis Dugas, Jr., Orange, for appellant.

Bill A. Martin, Dist. Atty., Charles R. Mitchell, Asst. Dist. Atty., Newton, for appellee.

## OPINION

BROOKSHIRE, Justice.

Appellant was convicted of felony theft. The punishment was assessed at 10 years confinement plus a fine of $10,000.00. The indictment arose because of the removal of more than $19,000.00 [indictment says of the value of more than $10,000.00] worth of timber from a tract of land in Newton County.

Sheriff Woods and another law enforcement officer received word that there was a cutting and removal of timber occurring on January 7, 1981. This information was that the timber cutting and removing was not authorized. Then, the Sheriff and a Ranger, named Davis, went to the site of the timber in question. Appellant acknowledged that he was in charge of the operation and that he was selling the timber. No consent or authorization had been given to the Appellant to cut or sell the timber. Trial was by jury. By the verdict of the jury, the Appellant was convicted of theft of timber valued at more than $10,000.00 in trial cause No. 3558.

## THE HISTORY OF THE CASE

The positions, briefs, authorities, and vehement oral arguments of the parties, induce an adequate recounting of the record.

Before the trial on the merits of the instant charge, the Appellant had been indicted for the same offense under another cause number, being cause No. 3343, in the District Court. That cause and the indictment were for theft of timber. That proceeding went to trial in May of 1982. On May 25, 1982, the State had presented its case. Mr. Whitehead moved for an instructed verdict. The court granted the same after dismissing the jury in cause No. 3343. Later on, the Appellant was reindict-

ed in cause No. 3407 and, later, under another indictment, numbered 3558. Each indictment had alleged a theft of over $10,-000.00 worth of timber in January of 1981. Appellant filed a plea of formal acquittal, apparently, in both cause Nos. 3407 and 3558. A hearing was held in cause No. 3407 and the plea was denied. There were several motions originally filed in cause No. 3407, which were said to be transferred to cause No. 3558. One such motion was a motion for change of venue, which, the Appellant alleges, was never controverted by the State.

Both Sheriff Woods and Ranger Roscoe Davis had received information from a Mr. Robert Williams that timber was being unlawfully taken from certain land in Newton County near a settlement known as "Biloxi". Mr. Robert Williams was identified as being an owner of a sawmill near the town of Bon Wier, in Newton County. Sheriff Woods, Ranger Roscoe Davis and Mr. Williams accompanied each other to the scene of the timber cutting. Ranger Davis recognized and saw Mr. Wilburn Whitehead at the scene of the timber removal and identified him as the defendant on trial. Whitehead seemed to be in charge of the cutting operation. He was instructing the workers and the saw hands. The Ranger asked Whitehead if he was taking the timber from the land and Whitehead replied that he was.

Over objections, a number of exhibits, being conveyances, were offered into evidence as Exhibits of the State, Nos. 12 through 28 with the exception of No. 24.

A surveyor testified that there was a 90 acre tract over which there were no conflicts of boundaries with a senior survey and that it was on this 90 acre tract where the timber in question had been denuded.

There was testimony in the record, undergirded by documentary evidence, that the status of the title to the 90 acres of timberland in question was no different on or about January 7, 1981, than it was at the time the judgment was entered in the related civil case. Also, the persons who took the position that they were the owners and, indeed, the record owners, had paid all the taxes due on the property.

We deem it noteworthy to point out that, at the time the Sheriff of Newton County, accompanied by Ranger Davis and another, actually went on the land in question and observed the actual cutting of the timber, the Appellant, Mr. Wilburn H. Whitehead, was at the scene of the timber cutting and was directing his rather large crew as to how to cut the timber. Significant, also, is the testimony that when Robert Woods, the Sheriff of Newton County, made a direct inquiry of Mr. Whitehead, at the scene of the cutting and while the timber was being cut, to the effect that the Sheriff asked Whitehead if he, Whitehead, was selling the timber; Whitehead replied: "I'm damn sure not giving it away." The Sheriff then testified that this "colorful language", in addition to other actions he observed, clearly indicated to him that the Appellant was in charge of the timber operation and the transporting and selling of same.

The Sheriff identified Whitehead, on the land, as being the same person who was seated in the District Courtroom at the counsel table as the defendant on trial.

The Sheriff also testified that he, in the past, had experience in timber cutting operations and that he had made a report of this incident or transaction. The Sheriff testified that, on the occasion in question, he saw pulpwood being cut and loaded. He did not see any saw wood that had already been cut. The Sheriff further testified that all the timber he saw that day was not cut on the day he visited the scene of the timber operations. He testified, further, that there was a timber crew of about 5 men and that they could cut approximately 3 loads of pulpwood a day. The Sheriff did see some other stumps that had been previously cut. He testified that pulpwood up to about 24 inches was accepted at the Evadale Mill.

## TESTIMONY OF ROSCOE DAVIS, THE TEXAS RANGER

Ranger Davis, on January 7, 1981, had an occasion to go on the property where

the timber cutting in question was going on. It was located, definitely, in Newton County. He went with Sheriff Woods and Robert Williams. He, also, definitely saw the Appellant at the scene of the timber operation. He positively identified the Appellant in court as the director of the timber operations. The Appellant, at the scene, was wearing work clothes. To the Ranger, Whitehead seemed to be in complete charge of the timber cutting. Mr. Whitehead was instructing the workers and the "saw hands." Later, the Ranger went to the land again with a Mr. Kay Henson. The Ranger showed Mr. Kay Henson the exact property that he had visited on January 7, 1981, the date stated in the indictment. The Ranger did testify that he saw some of the people working at the scene that were actually "working to fill this truck". The Ranger testified that the truck was being loaded with logs.

## THE BOUNDARY CONFLICT QUESTION

Then, James Kay Henson was called to the stand. He was employed by Temple-Eastex, Incorporated. He was the manager of the Land Department. He testified that he is a Registered Surveyor in the State of Texas; that he supervised 3 survey crews. He testified that Temple-Eastex, his employer, had land in the area that adjoined the property in question. He testified that he examined State's Exhibit No. 27, which was a deed from Loftin to Cleavenger which described the tract of land involved. As well, he identified State's Exhibit No. 25, being a deed from Blackshear to Lucas Trust, as containing the same field notes that described the property in question where the cutting took place. He testified to virtually the same facts concerning State's Exhibit No. 22, being a deed from McDonald to Elmer Simmons. The registered surveyor also testified that he had been on the ground of the land in question. Henson did notice signs of timber cutting on the tract in question. In fact, he answered "Yes, it has been denuded, yes." He said he had been on the land on several occasions.

This registered surveyor had also been shown State's Exhibits Nos. 30 and 31. They were field notes prepared by one Frank Strother. Apparently, in the preparation of these field notes by Frank Strother, James Kay Henson had collaborated. These later field notes resolved any conflicts in the surveys. Apparently, some 25 or 30 acres of the land involved were in possible conflict with a senior survey. Henson testified that there existed about 90 acres that were free of conflict; that this 90 acre tract was shown by regular chain of title, from a surveyor's standpoint and a field note standpoint; and that those specific 90 acres were reflected correctly in State's Exhibits Nos. 30 and 31; and, the same 90 acre tract was the land that was actually denuded by Appellant.

On cross-examination, the accused's lawyer elicited that Mr. Henson worked for one of the largest timber owners in the county and that Henson and his employer had paid a forest crew and some other crews at the rate of about $250.00 to $325.00 a day, working on some of the evidence and exhibits in this case. Henson testified that he made about $40,000.00 a year, at the trial date; but, back in 1981, he made about $24,000.00 a year and that Henson had a certain "disaffection" for the Appellant. Henson admitted that his services, as well as the services of some of the crews of his employers, had been used and proffered to the District Attorney in this case. Henson reiterated that he had walked all over this tract, to an extent that he could actually see every boundary to it and that a lot of timber had been cut. He testified that everything that could be sold had been cut over the 90 acres of land.

Without objection, Henson testified that the letters he had written, concerned certain deeds into Whitehead. These deeds had been placed in the Deed Records of Jasper County as well as Newton County and that Whitehead was placing these deeds of record where he simply did not have any title to the property. Without objection, Henson further testified that this

was a "sort of modus operandi" of Appellant. Apparently, Henson had made an investigation of several tracts of land, some in Jasper County and some in Newton County, and he discovered that timber had been recently cut on some of these particular tracts of land. These involved tracts of land revealed "what we considered bogus deeds." On quite a few of these tracts, the timber had already been cut off. Later, without objection, Henson testified that Temple-Eastex was interested in "putting down any timber stealing and thieving that was going on adjacent to their property." Then, we find the following dialogue:

"Q Of course, they would be interested in putting down any timber stealing and thieving that was going on adjacent to their property?

"A This—This occurred on three of our tracts.

"Q Your answer to that would be yes?

"A Yes.

"Q So, there's no real personal vendetta that you hold against Mr. Whitehead, it's economically feasible for your company to put down timber stealing, isn't it?

"A If he'll quit stealing, I'll let him alone.

"Q A—An explanation for your writing these letters then, Mr. Henson, would be to warn these people that they stood a chance to be victims of—

"A Yes, sir.

"Q —timber thieving?

"A Yes, sir."

We think it is clear that the credibility of Henson and the weight to be given his testimony, as balanced against any personal dislike (if it existed) for the Appellant, were to be weighed by the jury. They are sitting in the box to pass upon the credibility of each witness and the weight to be given the testimony of each witness. It is Hornbook, trite law in Texas, but it is true, that the jury has vast discretion and power in these matters.

## PHILIP LUCAS

Philip Lucas testified that he had certain disabilities. Nevertheless, he had been on the land and viewed the land. He owned some other property in Newton County. Lucas had not given permission to Appellant to cut any timber. Lucas, along with others, had instituted a civil proceeding, involving the 90 acre tract. The proceeding was against Wilburn H. Whitehead, Jimmy Hoyt Whitehead and C.E. Jones.

Lucas testified in the related civil case. He said that Mr. Whitehead, the accused, had made a deed to his son, Jimmy, and 6 or 7 months later Jimmy conveyed the same tract back to Whitehead, the father. In the civil case, the deed from Wilburn Whitehead to his son and the deed back to the father were declared null and void. Clear title to the property was declared in the record holders and damages in the amount of some $80,000.00 were awarded. No amount of the damages awarded had been paid. Whitehead's interest was set aside as being null and void. Lucas was asked, in view of the $80,000.00 award:

"Q Have you received any money as a result of this lawsuit?

"A Not one penny.

"Q All right. Part of that lawsuit was seeking damages for the cutting of the timber out there on that tract of land, wasn't it?

"A Yes.

"Q And were damages awarded?

"A Yes, sir.

"Q But the awarding of damages has still not meant any money coming your way, has it?

"A Not one penny."

Philip Lucas took the position that he had a superior title to the property. He testified about a warranty deed from William McKinley Blackshear and his wife, Rosie Garrett Blackshear, to the Philip Bland Lucas Trust. It was dated March 21, 1955, being recorded in the Deed Records of Newton County in Volume 123, Page 402. That deed conveyed the property that was in question in this felony prosecution. It actually surveyed out 90.919 acres. There was an instrument, also, showing the termination of the Philip Bland

Lucas Trust from the Trustee, H.E. Dishman, to the beneficiary, Philip Bland Lucas. Hence, the title was vested in Lucas, personally. Lucas swore that the taxes on the 90.919 acre tract were paid every year and paid in full. Lucas further stated that the status of the title to the land in question, being the 90.919 acres, was not any different at the time of the judgment in the civil suit was taken than the title was in January, 1981. Lucas admitted being a part owner.

## GOLDA DAVIS

Next, was the witness, Golda Davis, who worked for the S.W. Stewart Abstract and Title Company as an abstractor. She testified generally how an abstract office works. She testified she had examined the title history on this tract back to 1888. She had prepared a "run sheet on the title to this property." She had brought this search forward to the last deed which was dated April 4, 1979. She also stated that, according to her search, there would be no instruments that would be omitted or left out of her search from 1888 to 1981, although the last deed to the land in question was dated April 4, 1979. She recalled the lawsuit involved Philip Lucas and others against Wilburn Whitehead, Jimmy Whitehead and C.E. Jones. From her search, from examining her records, the first time in the chain of title where either the name of Wilburn Whitehead or Jimmy Whitehead appeared was in 1975, when there was a deed from Wilburn H. Whitehead to Jimmy Hoyt Whitehead for 125 acres. She was asked:

"Q Do you see anywhere in there where Wilburn Whitehead obtained any title to convey to Jimmy Hoyt Whitehead?

"A There is none.

"Q Okay. So, it would be accurate to say that Wilburn Whitehead's or Jimmy Hoyt Whitehead's interests at that point just appeared out of the blue?

"A Yes, sir.

"Q A deed from his father to him?

"A That's correct. I assume it's a father-son, I don't know."

Ms. Davis testified that, in her opinion, as an abstractor, the deed from Wilburn Whitehead to his son, Jimmy Hoyt Whitehead, conveyed nothing. Then she did notice that the next conveyance was from Jimmy H. Whitehead to Wilburn H. Whitehead, dated December 13, 1978. This 1978 deed, from son back to father, involved the same property, being the 125 acres. She testified that since Jimmy Hoyt Whitehead obtained no title back in 1975, then, according to the record title, Wilburn Whitehead did not obtain any title in 1978. She characterized these deeds, even though placed of record, as being "[c]ompletely out of the blue."

Upon cross-examination, Golda Davis testified to a chain of title beginning in 1888 in a deed from R.A. Knight to Wash Farr for 125 acres, which was the beginning of the Wash Farr title. She did later testify to a patent from the State of Texas to William McFarland Lewis. She testified the survey obtained its name from William McFarland Lewis, who was the original patentee. In fact, the Appellant put the patent, which was D-6, into evidence; it was received in evidence.

## RICHARD ANTHONY (TONY) BENNETT

The next witness was Richard A. "Tony" Bennett. He was employed by Temple-Eastex, Inc., in Diboll, Texas. He had a Master of Science in Forestry Degree from Stephen F. Austin University. He went on the land in question in 1981. He appraised the volume of timber that had been cut off the tract. He had specialized training in such appraisal of volumes of timber. He reconstructed the stand by using several methods. One, he looked at the adjacent timber and the standing timber on ownership adjacent to the property. He made up a comparable list and measured the stumps. He reconstructed log heights and volume from adjacent standing timber. He admitted that his appraisal was an estimate, but he said it was an educated one.

He described further acts and actions, on his part, in connection with making his appraisal and estimate in some detail. From certain written data that he kept, including tally sheets, the State proffered Exhibit No. 34, a volume and cost sheet. State's Nos. 33 and 34 were offered. The pertinent Exhibit, being State's No. 33, shows that $19,465.00 worth of timber was cut from the Philip B. Lucas tract. A very considerable body and volume of evidence concerning the value of the timber is set forth in the record. The last witness, Mr. Bill Nichols, unequivocally said that there was "at least $19,000.00 worth of timber there." The State rested.

The Appellant, through his attorney, made a motion for an instructed verdict which was denied. Immediately thereafter, the defense rested, proffering no evidence and no witnesses.

The court agreed to submit this charge requested by the defendant:

"You are charged that if you believe from the evidence that the defendant, Wilburn H. Whitehead, believed he owned the land and timber in question at the time of the alleged offense, or if you have a reasonable doubt thereof, then you will find the defendant not guilty."

The only other objections, at the close of the evidence, was that the court had failed to define "timber"; and, secondly, that the defendant requested the court to include a lesser included offense of theft in the charge of the court. The court denied these last two matters. The jury obviously found the State's witnesses credible, finding a guilty verdict.

## PUNISHMENT PHASE

The punishment phase followed the next day. Without objection, the State put into evidence State's Exhibit No. 37, which was a copy of a judgment and sentence in No. 6159, State v. Wilburn Whitehead, Jasper County, Texas. There was no objection; it was received. It was a record of a judgment of the 1–A District Court of Jasper County, Texas, finding Wilburn H. Whitehead guilty of theft by a jury composed of Johnny G. Johnson and eleven others. The jury verdict was:

"We, the Jury, find the Defendant Wilburn H. Whitehead, guilty of the offense of theft and assess his punishment at confinement in the state penitentiary for 5 years and a fine of $1,000.00 and we recommend that such sentence be probated."

The State called A.W. Davis, a former County Attorney, as a witness. He was to testify that Wilburn H. Whitehead is one and the same person as was identified in State's Exhibit No. 37. Mr. Dugas then stipulated to that fact. Immediately after introducing Exhibit No. 37 and making the stipulation that Wilburn H. Whitehead was one and the same person in both cases, the defendant rested.

## GROUNDS OF ERROR—FORMER ACQUITTAL

No challenge attacks the sufficiency of the evidence. The Appellant's first ground of error or "ground for review", as he wrote it, is "[t]he trial court committed reversible error in overruling Defendant's plea of former acquittal." We find that the Appellant's plea of former jeopardy or former acquittal is based on the trial court's dismissal of an indictment in a previous cause. The previous indictment was *obviously fundamentally defective.* The previous indictment failed to allege a necessary element. The indictment failed to allege: "with intent to deprive the owner of the property". In *Smith v. State*, 571 S.W.2d 917 (Tex.Crim.App.1978), the court wrote, at pages 918 and 919:

"Appellant contends that the indictment is fundamentally defective for failing to allege all the essential elements of the offense of theft. We agree and reverse the judgment of conviction.

"The offense was alleged to have occurred on February 18, 1975. At that time, V.T.C.A., Penal Code, Sec. 31.03 defined the offense of theft as follows:

"'(a) A person commits an offense if, *with intent to deprive the owner of property:*

" '(1) he obtains the property unlawfully; or

" '(2) he exercises control over the property, other than real property, unlawfully.

" '(b) Obtaining or exercising control over property is unlawful if:

" '(1) the actor obtains or exercises control over the property without the owner's effective consent; or

" '(2) the property is stolen and the actor obtains it from another or exercises control over the property obtained by another knowing it was stolen.'[1] (Emphasis supplied.)"

Footnote No. 1 states:

"1. Sec. 31.03, supra, was amended in 1975 and now provides:

" '(a) A person commits an offense if he unlawfully appropriates property *with intent to deprive the owner of property.*

" '(b) Appropriation of property is unlawful if:

" '(1) it is without the owner's effective consent; or

" '(2) the property is stolen and the actor appropriates the property knowing it was stolen by another.' (Emphasis supplied)."

Citing further from *Smith v. State, supra,* we find, at page 918:

"... and the trial proceeded on the State's theory embodied in count two which failed to allege that appellant acted with 'intent to deprive the owner of property.'

. . . .

"We further held in *Cannon* that a *theft indictment is fundamentally defective when it fails to allege that the defendant acted with intent to deprive the owner of property, 'an element necessary to every theft allegation.'* We also stated:

" 'An indictment for theft which does not allege *all* of the elements of *one* of these methods is fundamentally defective, since "Everything should be stated in an indictment which is necessary to be proved." Art. 21.03, Vernon's Ann.C.C.P. See also Art. 21.11, V.A.C.C.P. ...' Ibid at 273" (Emphasis ours except for the words "Cannon", "all" and "one" in the last two paragraphs.)

*See also Ex Parte Cannon,* 546 S.W.2d 266 (Tex.Crim.App.1976). We agree that the statute referred to in *Smith, supra,* had been amended but, nevertheless, contained the same statutory, necessary element of "with the intent to deprive the owner of property". It should be noted that, in *Ex Parte Cannon, supra,* four different sets of possible circumstances involving the offense of theft are set forth and that each and every one contained the necessary pleading that the accused acted "with the intent to deprive the owner of property". See *Smith, supra,* at 919.

■ We hold that the previous indictment was void. Hence, the court lacked jurisdiction over the defendant. In view of the startling failure to allege the necessary element, the prior indictment could have been successfully attacked at any time, either through a motion to quash, or, for the first time, on appeal, or in a post-conviction writ of habeas corpus. The previous, totally void, indictment did not put the Appellant in jeopardy. Hence, his plea of formal acquittal is not sound.

When the indictment is totally void, the trial court simply does not have jurisdiction. Hence, the judgment is subject to collateral attack. *Ex Parte Charles,* 582 S.W.2d 836 (Tex.Crim.App.1979); *Ex Parte Russell,* 561 S.W.2d 844 (Tex.Crim.App. 1978); *Ex Parte Valdez,* 550 S.W.2d 88 (Tex.Crim.App. 1977). See also *Ex Parte Cannon, supra.*

Indeed, in a case where the charging instrument was void, the trial court "never acquired jurisdiction." *Ex Parte White,* 659 S.W.2d 434, 435 (Tex.Crim.App.1983). Also, an indictment is fatally defective if it fails to allege an offense. A fundamentally defective indictment is subject to collateral attack. *Ex Parte Wong,* 612 S.W.2d 548 (Tex.Crim.App. en banc 1981).

In *American Plant Food Corporation v. State,* 508 S.W.2d 598 (Tex.Crim.App. 1974), the unanimous court wrote, at page 603:

> "If the charge alleges an offense was committed by the defendant, then it is sufficient in law to support a verdict of guilty if one be rendered thereon. *If it does not so allege, then it is utterly insufficient and any conviction based thereon is void. A void conviction may be challenged at any time and thus an exception to the substance of the State's pleading, as set forth in Article 27.08, supra, may be raised for the first time on appeal....*" (Emphasis ours)

See *Pospishel v. State,* 95 Tex.Cr.R. 625, 255 S.W. 738 (1923); *Osborne v. State,* 93 Tex.Cr.R. 54, 245 S.W. 928 (1922).

Since jurisdiction of the court attempting to try the previous indictment was an absolutely essential prerequisite necessary for jeopardy to attach against the accused, and where, as here, the prior accusatory pleading was void, we determine that the plea of former acquittal must be disallowed. *Foster v. State,* 635 S.W.2d 710 (Tex.Crim.App. 1982); *McAfee v. State,* 363 S.W.2d 941 (Tex.Crim.App.1963).

In *McAfee, supra,* the unanimous court wrote, at page 941:

> "Jeopardy will attach only upon a good and sufficient accusatory pleading. Jurisdiction of the court trying the prior cause is an essential prerequisite where jeopardy is pleaded...."

At the prior proceeding, this Appellant was not found by a jury to be entitled to a verdict of acquittal. The contention of Whitehead attacked the defective and void nature of the previous indictment. Prior to submitting the case to the jury in the prior proceeding, the trial court dismissed the indictment, itself, as being a fundamentally defective indictment. The trial court properly disallowed the Appellant's plea of former acquittal under this record.

Indeed, in *Durrough v. State,* 620 S.W.2d 134 (Tex.Crim.App., en banc, 1981), Judge Roberts wrote, at page 137:

> "... Whether there can be a new trial for the same offense after a mistrial or the dismissal of an indictment over the defendant's objection depends on whether there is a manifest necessity for the early termination of the first trial, or the ends of public justice would otherwise be defeated. *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The Supreme Court of the United States has specifically held that a new trial is not barred by the Double Jeopardy Clause when a mistrial is declared because the indictment was insufficient to charge an offense."

When the State rested its case in chief, in trial cause No. 3343, the defendant made two separate motions for instructed verdict. The first one was overruled. The second one was granted. The second motion for an instructed verdict pleaded that the instructed verdict should be granted. We observe:

> "[BY MR. DUGAS:] ... for the reason that the Indictment is fundamentally defective for failing to allege [']with intent to deprive anybody of their property['.]"

Thereafter, the Court took a 15 minute recess. Then the Court announced:

> "THE COURT: In connection with the motion of the defendant concerning the failure of the Indictment to allege the element of intent to deprive the owners of the property, that motion will be granted. The Indictment will be dismissed as to that particular ground—failure to set forth that element."

Hence, under well-settled, decisional law, the Appellant's defense of former acquittal cannot be sustained.

## CONTENTION THAT TIMBER IS NOT DEALT WITH IN NEW PENAL CODE OF 1974

■ In his second ground for review—a ground of error—the Appellant says his motion to quash should have been granted. His motion to quash was based upon the failure of the pertinent modern Code to reenact the relevant provisions of the Penal Code 1925, which provided sanctions for

cutting and carrying away timber. Appellant contends:

> "... [E]nacting the Penal Code of Texas 1974, Article 1379 was repealed. It was not reenacted into the new Penal Code of Texas 1974. Section 31.02 Penal Code of Texas enumerates each statute brought forward into the new theft statute. There are twelve theft statutes listed, and Article 1379 is not listed."

Therefore, Appellant vehemently argues that, since old, repealed *TEX.PENAL CODE art. 1379* (Vernon 1925) dealt with the cutting and carrying away of merchantable timber, it is no longer an offense to cut, sever and then appropriate timber in Texas.

But *TEX.PENAL CODE ANN. sec. 31.01(6)(B)* (Vernon 1974) provides that property that is subject to theft is defined to mean:

> "(B) tangible or intangible personal property including anything severed from land...."

We are reminded that this very contention has been rejected by the Ninth Court of Appeals in an interesting, prior proceeding, involving the same Wilburn H. Whitehead. In *Wilburn H. Whitehead v. State*, 645 S.W.2d 482 (Tex.App.—Beaumont 1982), rehearing denied; and, discretionary review refused on December 8, 1982, Justice Keith, for a unanimous court, wrote an opinion holding that timber was "property that was subject to the offense of theft. Reviewing the prior prosecution of Wilburn H. Whitehead, in Jasper County, as being a prosecution based on *TEX.PENAL CODE ANN. sec. 32.01(2)(B)* (Vernon 1974), the court reasoned the definition found in *sec. 32.01(2)(B)* is the same as *sec. 31.01(6)(B)*. Section 32.01(2)(B) provides:

> "(2) 'Property' means:
>
> ....
>
> "(B) tangible or intangible personal property including anything severed from land...."

Under *Chapter 31*, entitled "Theft", *sec. 31.01(6)(B)* reads, in an identical manner:

> "(6) 'Property' means:

> ....
>
> "(B) tangible or intangible personal property including anything severed from land...."

The words used (and even the quotation marks) are identical. Under this record, it is glaringly clear that the timber was property severed from the land which was cut down and placed on trucks for transportation. We overrule this ground of review [ground of error].

### KIND OF TIMBER AND AMOUNT TAKEN

■ Next, the Appellant says the trial court committed reversible error by refusing to require the indictment to describe the number, detailed quantity or kind of timber alleged to have been taken. We think the trial court properly overruled this portion of the motion to quash. The word "timber" has a well-known and well-understood meaning. Also, under this record, we think the Appellant had actual, detailed, personal knowledge of what the indictment charged. The record is glaringly clear that, when the Sheriff, Ranger Davis and another citizen visited the scene, Mr. Whitehead was actually on the ground where the timber operation was taking place. He responded to the Sheriff's questions as set out above. It is obvious that the accused was familiar with timber operations. And from a reasonable, logical and practical standpoint, in a case of this type, *after the cutting*, the grand jury could not have set forth the exact kind of trees or timber and the exact number and description of the trees or remnants thereof. This would necessarily be true because the physical manifestations left behind, being part of the clues thereof, would be stumps of various kinds and various sizes. Also, there would be various types of trimmed-off limbs. Certainly, the remaining stump could not determine whether that particular tree grew straight or crooked or had a large hole in it. The stump could not determine whether the tree grew tall and, hence, could have been a marketable saw log or piling. The brush left—and by brush, we mean the trimmings, the limbs, the twigs,

the tops of the trees—could not determine with exactness all of the kind, type, number and volume of timber severed. The trial judge, in view of this unusual record, with the Appellant being on the land when discovered and being in charge of and directing the forest crew, was well within his discretion to overrule the motion to quash. We definitely perceive that the Appellant had actual detailed notice of the offense with which he was charged. The pictorial evidence in the case shows the Appellant personally on the ground where the timber cutting operation was taking place. State's Exhibits Nos. 3, 4, 8, 9 and 10 show the truck (or trucks) that were loaded with the timber on the day the Sheriff, the Ranger and a citizen visited the scene. State's Exhibit No. 11 was identified as the back of Ranger Davis with Mr. Wilburn Whitehead facing forward toward the camera. These exhibits were admitted into evidence without objection.

### AMOUNTS AGGREGATED CONTENTION

■ Then the Appellant says that the trial court committed reversible error by failing to require the indictment to give notice that the "amounts were being aggregated." *TEX.PENAL CODE ANN. sec. 31.09* (Vernon 1974), entitled "Aggregation of Amounts Involved in Theft" specifically and literally provides:

"When amounts are obtained in violation of this chapter *pursuant to one scheme or continuing course of conduct,* whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." (Emphasis added)

We construe the statute in a practical, logical and reasonable manner. The evidence in this case demonstrates, without contradiction, that timber is a commodity which can be appraised or measured by three different scales. These scales are equally acceptable and known throughout the timber industry. They are the International Scale, the Doyle Scale, and the Schribner

Scale. And, in using these three scales, a different volume of timber would be ascertained. The indictment is in plain language. Under this unusual record, we find he had full and fair notice of the charges against him. The indictment, in part, in plain, clear and unambiguous language, charged:

"... [T]hat Wilburn H. Whitehead, on or about the 7th day of January, A.D. 1981, and before the presentment of this indictment, in said County and State, did then and there intentionally and knowingly, appropriate, by acquiring and otherwise exercising control over, property, to-wit: timber of the value of more than $10,000.00, without the effective consent of PHILIP B. LUCAS, owner and possessor of said property, with the intent to deprive the owner of said property...."

*See Kinner Transp. & Enterprises, Inc. v. State,* 644 S.W.2d 69 (Tex.App.1982, writ ref'd n.r.e.). It is demonstratively shown from the record that the Appellant's able attorneys were able to thoroughly and intelligently cross-examine all the State's witnesses concerning the species of trees, the kinds of timber, the amount, the value and the appraisals of the marketable timber taken. A careful review and analysis of the cross-examinations in this case lucidly show that the Appellant received adequate notice from the allegations in the indictment. We overrule this ground of error.

■ The indictment set forth the time as "on or about the 7th day of January, A.D. 1981." Under the appropriate, governing, statutes there is certainly no requirement that the offense must be completed in a single day. We overrule Appellant's ground of review [ground of error] 2(c). Appellant, on this last point, cites *Turner v. State,* 636 S.W.2d 189 (Tex.Crim.App. 1980). We think *Turner, supra,* is meaningfully different and is not determinative of this appeal. It is certainly not controlling. In *Turner, supra,* the appellant was convicted of theft through the falsification of numerous medicaid claims; some of the claims were valid, others not.

## THE MOTION FOR CHANGE
## OF VENUE

Appellant advances that reversible error occurred when the trial court refused to grant the Appellant's motion for change of venue. The Appellant refers to a motion for change of venue, *which was filed in another cause,* being cause No. 3407, *The State of Texas v. Wilburn H. Whitehead.* The trial court number involved in this appeal was 3558. The supporting affidavits were also filed in cause No. 3407. There is no certificate of service, showing the forwarding of a copy of these pleadings (the affidavits) to the district attorney, nor is there any certificate of service on the motion. There is no showing in the record that the district attorney had any notice of any order of transfer from cause No. 3407 to cause No. 3558. Both the motion to transfer and the order are without certificates of service. The record fails to show that the district attorney's office was ever provided with notice of any kind concerning the Appellant's motion to change venue prior to the day of the trial on the merits.

It is interesting to note that the transcript does reveal that the Appellant filed a number of other motions. First, there was a motion to quash the indictment, filed November 21, 1984, containing a certificate of service. There was another motion to quash the indictment, filed in cause No. 3407, having been filed on May 12, 1983, containing a certificate of service. Also, a motion to suppress was filed on March 4, 1985, relating to suppressing the testimony concerning the counting of the stumps, which contained a certificate of service. A waiver of a speedy trial was filed, waiving all rights of this Appellant afforded by *TEX. CODE CRIM.PROC.ANN. art. 32.01* (Vernon 1966), and the Constitution of Texas and the United States, which contained a certificate of service, specifically naming Bill Martin as the District Attorney in Newton County. That waiver was filed March 19, 1984. Amazingly, there was *also a motion to dismiss for failure to provide a speedy trial which contained a certificate of service.*

Furthermore, it was only after the jury list had been called and the jurors qualified, with all legal excuses having been taken, and after the clerk was instructed to draw a specific jury panel or list, which was done; and, in fact, after the jurors had been instructed to answer the attorneys' questions, that the Appellant, belatedly, advised the court that there were some motions to be heard. At this point, upon retiring to chambers, the Appellant proffered a statement of facts in cause No. 3407 and cause No. 3343. These prior statements of facts were tendered to support the prior jeopardy motion of Appellant.

The Statement of Facts brought forward to us, in trial cause No. 3407, demonstrates that the Motion for Change of Venue was not urged. It was not even called to the attention of the court. It was waived in cause No. 3407. Likewise, in trial cause No. 3343, the Motion for Change of Venue was not urged or even presented to the trial court. It was not called to the attention of the trial court; it was waived.

Then, the able attorney for Appellant challenged the authority of the Honorable Shelley Hilliard to participate in the trial. Then, the motions to quash indictments were taken up. These motions had certificates of service on them. Then, at the very last, the motion for change of venue was called to the attention of the court. The record shows that the district attorney was not aware of such a motion being on file. The lack of a certificate on the same bears that position out. The position taken by the Appellant was that it was filed in No. 3407, but transferred to the cause on trial. But the court unequivocally stated:

"The Court has no knowledge of that ... It hasn't been properly presented to the Court."

The trial court certainly unequivocally stated that the court had no knowledge of the motion for transfer of venue. The court also impliedly found that the district attorney had no notice or knowledge of the said motion to change venue.

Moreover, the position of the district attorney is borne out and corroborated by the various motions in the transcript, referred to above. In any event, the attorney for the Appellant did send copies of a *number of motions and pleadings* wherein, by certificate of service, he showed that the district attorney was favored with a copy. We are unwilling to hold that the district attorney should be manditorily required to periodically check the district clerk's offices in the several counties of his district to see what pleadings have been filed by numerous defendants in various pending criminal cases.

■ But there is yet another compelling reason for overruling this ground of error. The Appellant waived a hearing and a ruling on this motion for change of venue. He did this by failing to present the same at the time the trial court directed him to do so. The record sets forth that there was a call of the docket on Friday, February 8, 1985, at 1:30 P.M. The criminal cases were set for trial for the week of Monday, March 4, 1985. The notice provided that "[a]ll dilatory pleas, special exceptions, etc., ... will be heard immediately after the call of the docket....", which was February 8, 1985. The notice specifically mandated "[a]ll such matters not *presented at such time will be considered waived.*" By failing to present the motion for change of venue on February 8, 1985, the Appellant affected a waiver of said motion.

Appellant's attorneys have not taken the position, nor do they represent in any way, that they did not receive this notice of the call of the docket setting the motions for hearing. Neither of the attorneys for the Appellant made any averment, nor took the position, nor made any attempt to place in the record any matter that tended to show they did not receive a copy of the notice of the docket call. Indeed, "appellant made no showing of harm or prejudice so as to justify reversal...." This quote is taken from *Postell v. State*, 693 S.W.2d 462, at 464–65 (Tex.Crim.App.1985).

In any event, *TEX.CODE CRIM.PROC. ANN. art. 28.01, sec. 1(7)* (Vernon 1966) specifically provides:

"Motions for change of venue by the State or the defendant; provided, however, that such motions for change of venue, *if overruled at the pre-trial hearing,* may be renewed by the State or the defendant during the voir dire examination of the jury...." (Emphasis added)

Under this record, the Appellant and his able attorneys of record were ordered to present such a motion, as specifically provided for in *art. 28.01, sec. 1(7),* and to be present and to be heard thereon on Friday, February 8, 1985, at 1:30 P.M. They failed. Therefore, the motion for change of venue was waived. Since it was not presented under the notice, nor overruled, it could not be renewed by the Appellant during the voir dire examination of the jury. We overrule ground of error 3.

The last ground for review [ground of error] briefed complains of the introduction of 17 deeds into evidence. We, again, adhere to the decision of the Ninth Court of Appeals in *Whitehead v. State*, 645 S.W.2d 482 (Tex.App.—Beaumont 1982, writ ref'd). We quote from *Whitehead, supra,* at page 484:

"At the outset of our discussion of these two grounds, we express our agreement with this holding in *Moore v. State*, 160 Tex.Cr.R. 183, 268 S.W.2d 187, 189 (1954):

" 'Criminal courts are not the forum for determination of disputed titles to real estate, and a criminal prosecution is not the medium for making such determination.' "

We do not, in this appeal from a conviction, undertake an appellate review guided by the rules which would govern an appeal of a judgment entered in a suit of trespass to try title. Consequently, we do not recite the evidence of the surveyors as to the location of the land involved, nor do we undertake to determine superior title to the land. Instead, we apply the usual standard of review of

**658**

judgments of conviction. Such a rule has been stated many times, one being *Jones v. State*, 582 S.W.2d 129, 132 (Tex. Cr.App.1979):

"'Upon review by this Court, the evidence must be viewed in light most favorable to the jury's verdict.'

Having done so, we find no merit to either of the complaints now presented. It was for the jury to determine, under the guidance of the court's charge, if the complaining witness had a greater right of possession to the timber taken from the premises than did appellant. See *Sec. 1.07(a) (24 and 28), Tex.Penal Code Ann.*, defining 'Owner' and 'Possession', respectively. See also, generally, *Compton v. State*, 607 S.W.2d 246, 250 (Tex. Cr.App.1980)."

We observe that the State deraigned the title from 1888 to the date of the trial by deeds showing a regular chain of title into Philip B. Lucas and the other owners. A patent from the State to the original patentee, William McFarland Lewis, was introduced by Appellant, through cross-examination of State's witness, Golda Davis. The land, the 90 acres, is in the William McFarland Lewis Survey.

After carefully considering the deeds, the verbal testimony, the field notes, and other evidence, we think the State discharged its burden fully. Appellant offered no evidence of title except a deed from himself to his son; then a deed from his son back into himself. We perceive no chain of title or claim that would conceivably place Wilburn H. Whitehead in a position to convey any part or parcel of this land, or interest in this land, to his son. We willingly, assiduously adhere to the well-established rule that has been pronounced many times, as clearly stated in *Jones v. State, supra.*

Following the literary lead of Presiding Judge Onion, in *Hankins v. State*, 646 S.W.2d 191, 203 (Tex.Crim.App.1981), reciting from Shakespeare's Macbeth, Act 2, Scene 2, as well as following Judge Clinton, in *Cane v. State*, 698 S.W.2d 138, 141 (Tex. Crim.App.1985), dissenting from the Opinion on State's Petition for Discretionary Review, reciting from Carroll, *Through the Looking Glass*, Ch. 4, quoting the Walrus, we deem it apropos to recite this verse from WILLIAM MANCHESTER, THE LAST LION, WINSTON SPENCER CHURCHILL, VISIONS OF GLORY, (1983):

"Dear-bought and clear, a thousand year, Our fathers' title runs.
Make we likewise their sacrifice, Defrauding not our sons."

We would substitute "a hundred year".

We overrule Appellant's last ground of error, as well as the other grounds of error, and we affirm the judgment and sentence below.

AFFIRMED.